UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| FRANK YOUNG, by Natural Father and Administrator Ad Prosequendum of the ESTATE OF DASHAWN TAHREE YOUNG, and FRANK YOUNG, individually | : : : : : | Civil Action No.: 2:05-cv-00964 (PGS-ES) |
| Plaintiffs, | : | |
| vs. | : : | **CIVIL ACTION** |
| FRIGIDAIRE COMPANY, ELECTROLUX, WHITE CONSOLIDATED INDUSTRIES, JOHN DOE 1-10 (fictitious names), ABC CORP, 1-10 (fictitious names), PETER POE 1-10 (fictitious names) AND XYZ CORP. 1-10 (fictitious names), | : : : : : : : | |
| Defendants. | : : | |

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**GOLDBERG SEGALLA LLP**
301 Carnegie Center Drive
Suite 101
Princeton, New Jersey 08540
(609) 986-1300

Attorneys for Defendant,
Electrolux Home Products, Inc.

David S. Osterman, Esq.
Of Counsel
David S. Osterman, Esq.
Sarah X. Fang, Esq.
On the Brief

## TABLE OF CONTENTS

Table of Authorities............................................ii

STATEMENT OF MATERIAL FACTS.....................................1

    A.    The Incident..........................................1

    B.    The Washer............................................1

    C.    Plaintiff's Emotional Distress Claim..................3

    D.    Plaintiff's Punitive Damages Claim....................6

LEGAL ARGUMENT..................................................9

I.    SUMMARY JUDGMENT STANDARD..................................9

II.    PLAINTIFF'S EMOTIONAL DISTRESS CLAIM MUST BE DISMISSED
    AS A MATTER OF LAW........................................10

    A.    Plaintiff cannot establish that she was
        contemporaneously aware of the accident and,
        therefore, summary judgment should be granted.........15

    B.    Plaintiff cannot establish the requisite severity
        of an emotional distress claim .......................27

III.  PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES..............33

CONCLUSION.....................................................41

## TABLE OF AUTHORITIES

### FEDERAL CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
(1986).....................................................9

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).........9

Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860,
864 (3d Cir.1986)........................................9

Powers v. Sissoev, 39 Cal. App. 3d 865
(D. Ct. App. 1974)......................................19

### STATE CASES

Ahn v. Kim, 145 N.J. 423 (1996)...........................31

Berg v. Reaction Motors, 37 N.J. 396, 414 (1962)...........35

Bischoff v. Kohlrenken, 185 N.J. Super. 548
(Law Div. 1982).......................................18-19

Boryszewski v. Burke, 380 N.J. Super. 361
(App. Div. 2005)........................................28

Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 368
(1988)..................................................30

Carey v. Lovett, 132 N.J. 44, 62 (1993)...................15,
19, 27, 31

Decker v. Princeton Packet, Inc., 116 N.J. 418, 431
(1989)................................................28, 30

Dillon v. Legg, 441 P.2d 912 (Cal. 1968)..................12

Dunphy v. Gregor, 136 N.J. 99, 107 (1994).................13

Falzone v. Busch, 45 N.J. 559 (1965)......................11

Frame v. Kothari, 115 N.J. 638, 641 (1989)................10,
15-16, 19-22,
25, 26

Graf v. Taggart, 42 N.J. 303, 312-313 (1964)...............11

Johnson v. Mountainside Hosp., 239 N.J. Super. 312, 327, (App. Div.) certif. denied, 122 N.J. 188 (1990)...............15, 25

Lindenmuth v. Alperin, 197 N.J. Super. 385
(Law Div. 1984).......................................15, 25

Maldonado v. Leeds, 374 N.J. Super. 523, 529 (App. Div.
2005)....................................................28

Mealey v. Marella, 328 N.J. Super. 129, 140-41 (Law Div.
1999)....................................................26

Ortiz v. John D. Pittenger Builder, Inc., 382 N.J. Super.
552 (Law Div. 2004).....................................21

Parks v. Pep Boys, 282 N.J. Super. 1, 18
(App. Div. 1995)........................................35

Pavlova v. Mint Management Corp., 375 N.J. Super. 397, 404
(App. Div. 2005), cert. denied, 184 N.J. 211 (2005)........35

Portee v. Jaffee, 84 N.J. 88 (1980)..............10-15, 17,20,
                                                   22, 27, 33

Rocci v. MacDonald-Cartier, 323 N.J. Super. 18 (App. Div.
1999)....................................................30

Smith v. Whitaker, 160 N.J. 221 (1999)....................35

Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 360 N.J.
Super. 265, 271 (App. Div.), aff'd in part, rev'd in part,
181 N.J. 70, (2004).....................................27

Trisuzzi v. Tabatchnik, 285 N.J. Super. 15
(App. Div. 1995)........................................29

Tynana v. Curzi, 332 N.J. Super. 267 (2000)...............26

Vasilik v. Federbush, 327 N.J. Super. 6, 12
(App. Div. 1999)......................................15, 25

Wolfe v. State Farm Ins. Co., 224 N.J. Super. 348, 353
(App. Div. 1988)........................................31

**STATUTES**

Fed.R.Civ.P. 56(c)..........................................9

N.J.S.A. 2A:15-5-5.9.......................................35

N.J.S.A. 2A:15-5-5.10......................................34

N.J.S.A. 2A:15-5-5.12......................................33

N.J.S.A. 2A:15-5-5.12(b)...................................34

## STATEMENT OF MATERIAL FACTS

### A.   The Incident

1.   On January 26, 2003, decedent, Deshaw Young, then twelve years old, was found dead by his mother with the empty sleeve of his sweater wrapped around the agitator of a top loading washing machine manufactured by defendant Electrolux Home Products, Inc. ("Electrolux"). (See Osterman Aff. at Exhibit A).

2.   When he was found, the machine was off, the lid was open, the clothes in the washer were dry, and the machine was set to "final spin." (See Osterman Aff. at Exhibit B).

3.   His right arm was free of the sweater. (See Osterman Aff. at Exhibit A).

4.   The sweater had tightened around decedent's neck, strangling him to death. (See Osterman Aff. at Exhibit A).

5.   Plaintiff did not witness the incident, but estimates that decedent was downstairs in the basement alone "doing chores" for approximately 20 to 45 minutes before she went downstairs and found his body. (See Osterman Aff. at Exhibit A).

### B.   The Washer

6.   The washer in question was equipped with a lid lock mechanism, designed to prevent operation of the

machine during the spin cycle when the lid is open.   Report of Frank Schwalje at p. 4 (attached to Osterman Aff. at Exhibit C).

7.   The mechanism works by way of an interlock switch located below the top cover of the machine, which senses the position of the lid.   Id.

8.   A plastic latch on the lid fits through a hole on the top surface of the machine, just below the cover.   Id.

9.   When the lid is closed, the plastic latch fits through the hole and depresses the interlock switch.   Id.

10.  The washer will not begin the spin cycle unless the lid is closed and the interlock lever is depressed. Id.

11.  When the machine goes into the spin cycle – either automatically during the wash cycle or manually by movement of the dial – the plastic latch is automatically locked, preventing the lid from being opened.   Id.

12.  The washing machine was inspected by the police, the United States Consumer Product Safety Commission and all parties, and all found that the lid lock mechanism was in good working order and operated properly and as intended. (See Osterman Aff. at Exhibit D, E, and F).

13.  According to Fred Pauk, the former Manager of Product Safety and Compliance for Electrolux engineer, the

2

only way for the machine to have been operated in the spin cycle with the lid open in this case (given the fact that the lid lock device was confirmed to be working normally immediately after the accident and given that the clothes found in the washer were dry, not wet) would have been for decedent (or some one else) to have intentionally defeated the lid lock mechanism by 1) opening the lid, 2) placing an object (such as screw or a pen) in the opened the lid, in the opening to depress the lid lock lever, 3) and then, while continuing to hold down the lever, reach behind the open lid to set the dial manually to the "spin" position and then 4) pull the dial, and engaging power to the washer. (Deposition of Fred Pauk, at 28:4-24).

14. While doing all of this, for this accident to have happened, plaintiff must also have had one arm out of his sleeve, with the empty sleeve dangling into the washer opening, far enough into the drum to become entangled around the agitator when the washer went into spin. Id.

C. **Plaintiff's Emotional Distress Claim**

15. Plaintiff, Tamika Fitzgerald, is decedent's mother.

16. Plaintiff did not witness the accident. Tamika Fitzgerald's Dep. at 95:15-96:10 (attached to Osterman Aff. at Exhibit G).

3

17.   Plaintiff estimates that the last time plaintiff saw decedent alive was at approximately 3:00 pm., when decedent brought a load of dried clothes into plaintiff's bedroom and informed her that he was returning to the basement.  (See Osterman Aff. at Exhibit A).

18.   Sometime later, after calling decedent's name and getting no response, plaintiff left her bedroom to search for him.  (See Id.).

19.   Plaintiff entered the basement and observed her son's body slumped over the washing machine.  (See Id.).

20.   When she first observed him, decedent was unconscious, not breathing, and had no pulse.  (See Fitzgerald Dep. at 108:15-25).

21.   He was not bleeding and the only visible marks she observed was a "red spot" on his mouth.  (See Id. at 109:1-5).

22.   She removed his body from the washer and laid it on the floor and promptly called the police.  (See Id. at 109:12-19).

23.   The police records indicate they received a 911 call at 3:43 p.m. and paramedics and ambulance thereafter were dispatched to plaintiff's home.  (See Osterman Aff. at Exhibit A).

24. When the paramedics arrived, plaintiff was instructed to go upstairs in order to give them room to work. (See Fitzgerald Dep. at 112:24-113:11).

25. Plaintiff went upstairs at that point and did not witness the paramedics' attempt to revive decedent. (See Id.).

26. Decedent was taken to the hospital and was pronounced dead at 4:17 pm. (See Report of Cyril Wecht at p. 3 attached to Osterman Aff. at Exhibit H).

27. Plaintiff's forensic pathology expert, Dr. Cyril Wecht, has opined that decedent lost consciousness somewhere between ten and sixty seconds after his sleeve became tangled in the washer. (See Id. at 5).

28. Wecht further opines that decedent died of asphyxiation within minutes of losing consciousness. Id.

29. Thus, decedent was unconscious by the time plaintiff found him and, in all likelihood, was also already dead.

30. After the accident, plaintiff did not seek any psychiatric help, although counseling has apparently been offered to her through DYFS and through her employment. (See Report of Dr. Harvey Hammer at p. 2 attached to Osterman Aff. at Exhibit I).

31.  Plaintiff returned to work three weeks after the incident and has continued to work as a postal carrier since then. (See Id. at 5 and Report of Dr. Cheryl Wong at p. 3 attached to Osterman Aff. at Exhibit J).

32.  She is currently in a stable, long term relationship and she continues to take care of her other child.  (See Report of Hammer at p. 5).

33.  Plaintiff has identified an expert, Dr. Cheryl Wong, as an expert in psychology in connection with this case.

34.  Dr. Wong met with plaintiff one time for about an hour.  (Wong Dep. at 11:22-12:15).

35.  Dr. Wong opined that plaintiff suffers from post-traumatic stress disorder and major depressive disorder. (See Report of Wong at p. 3).

36.  Plaintiff told Dr. Wong that the only activity of daily living that her emotional state interfered with was "sleeping."  (See Id.)

D.    **Plaintiff's Punitive Damages Claim**

37.  The washer's design was reviewed, tested and certified by Underwriters Laboratory, meaning it complied with numerous safety codes and standards, including but not limited to those of the Underwriters Laboratory Standard 2157.  (Pauk dep. at 93:2-8).

6

38.   The washer has never been recalled.

39.   The police investigated the incident, including the washer, and found nothing wrong with the washer.   (See Osterman Aff. at Exhibit F).

40.   The CPSC investigated the incident and determined that the washer was not defective and complied with all applicable safety standards, including UL 2157.   (See Osterman Aff. at Exhibit D).

41.   The lid lock mechanism was inspected multiple times, by the parties and their experts, in addition to the police and the CPSC, following the accident and each time was found to work properly, and as intended.   (See Osterman Aff. at Exhibit D, E and F).

42.   There is no evidence that the washer or lid lock mechanism malfunctioned.   (Pauk dep. at 47:17-25).

43.   A dry wall screw was found inside the washer housing that was of a size and shape that could have been used to bypass the locking mechanism.   (Pauk dep. at 57:9-21, Osterman Aff. at Exhibit F).

44.   The lid lock mechanism was not "easily" bypassed; it took a series of deliberate actions.

45.   Any safety interlock device is capable of being bypassed by a determined user.   (See Schwalje Report at p. 8).

46.  Warnings on the product state:

    Close lid.  Washer does not advance into
    spin unless lid is closed.  For your safety
    lid automatically locks during spin portions
    of each cycle.  Lid automatically unlocks
    approximately one minute after cycle ends.

The warnings on the product further state:

    To avoid damages to machine, fire or
    personal injury, read important safety
    instructions in Owner's Guide before
    operating.

(Osterman Aff. at Exhibit P).

47.  The Owner's Guide further provides additional

warnings.  At page 3, the warnings state:

    **Warning!**  To prevent injury, do not reach
    into the washer while parts are moving.
    Before loading, unloading, or adding items,
    push in the cycle selector knob and allow
    the tub to coast to a complete stop before
    reaching inside.

    ! Failure to comply with these warnings
    could result in serious personal injuries.

The Owner's Guide further provides, under the heading

"Protect Children":

    **Warning!**  Do not allow children to play on
    or in the washer.  Close supervision of
    children is necessary when the washer is
    used near children.  As children grow, teach
    them the proper, safe use of all appliances.

(Osterman Aff. at Exhibit Q and see Pauk dep. at 66:5-67:13

and 69:18-70:4).

## LEGAL ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed.R.Civ.P. 56(c)).   In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party. Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir.1986).   The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).   "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. at 248 (internal quotations and citations omitted). Defendant Electrolux is entitled to partial summary judgment in this case because plaintiff is unable to raise

a triable issue of material fact in support of several prima facie elements of her emotional distress claim.

## II.   PLAINTIFF'S EMOTIONAL DISTRESS CLAIM MUST BE DISMISSED AS A MATTER OF LAW

The New Jersey Supreme Court has noted that "[t]he history of claims for the negligent infliction of emotional distress is one of increasing recognition of psychic injury tempered by a concern for 'speculative results or punitive liability.'" Frame v. Kothari, 115 N.J. 638, 641 (1989).

In the seminal case of Portee v. Jaffee, 84 N.J. 88 (1980), a 7-year old boy was killed when his body became trapped in an elevator door and he was dragged up several floors when the elevator was activated. Id. at 100. The boy's mother came upon the scene while her son was still trapped in the elevator and watched helplessly as paramedics tried to remove him from the elevator. Id. at 91-92. According to the Court:

> The officers worked for four and one-half hours to free the child. While their efforts continued, the plaintiff watched as her son moaned, cried out and flailed his arms. Much of the time she was restrained from touching him, apparently to prevent interference with the attempted rescue. The child suffered multiple bone fractures and massive internal hemorrhaging. He died while still trapped, his mother a helpless observer.

Id. at 91.

At issue in Portee was whether the mother could recover for her own emotional distress for witnessing the accident, even though she was not physically injured by defendant's alleged negligence and she was admittedly never actually in the "zone of danger" herself.  Traditionally, recovery for emotional distress in personal injury cases required proof of some direct physical impact.  See Graf v. Taggart, 43 N.J. 303, 312-313, (1964). "Direct impact" defined the scope of foreseeable harm and was said to be a necessary requirement to guard against the potential for "speculative" and "specious" claims and to prevent a "flood of litigation" if every family member could bring their own individual claim for emotional distress and grief following an accident to a loved one.  Portee, supra, 84 N.J. at 93.

The New Jersey Supreme Court replaced the "impact" rule with the so-called "zone of danger" rule in 1965, permitting recovery for emotional distress to those who were in close enough proximity to the accident to have been fearful for their own safety caused by fright from being at personal risk of injury, even in the absence of any actual physical contact.  Falzone v. Busch, 45 N.J. 559 (1965). The issue for the court in Portee was whether a mother could recover for the emotional distress caused by having witnessed her son as he was slowly crushed to death, even

11

though she herself was never in danger of being trapped in the elevator.

The Portee Court modified the "zone of danger" rule to permit recovery even where the plaintiff was neither directly injured nor personally threatened by the defendant's alleged negligence. In doing so, the Court "refined" the existing standard to permit recovery while still guarding against the possibility of "speculative results or punitive liability:"

> The task in the present case involves the refinement of principles of liability to remedy violations of reasonable care while avoiding speculative results or punitive liability. The solution is close scrutiny of the specific personal interests assertedly injured. By this approach, we can determine whether a defendant's freedom of action should be burdened by the imposition of liability.

Id. at 97. Relying heavily on the California Supreme Court opinion, Dillon v. Legg, 441 P.2d 912 (Cal. 1968)(en banc), the Portee Court adopted the following prima facie requirements for an emotional distress claim brought by bystanders under New Jersey law:

> The cause of action we approve today for the negligent infliction of emotional distress requires proof of the following elements:
>
>> (1) the death or serious physical injury of another caused by defendant's negligence;

12

> (2) a marital or intimate, familial relationship between plaintiff and the injured person;
>
> (3) observation of the death or injury at the scene of the accident; and
>
> (4) resulting severe emotional distress.
>
> We find that a defendant's duty of reasonable care to avoid physical harm to others extends to the avoidance of this type of mental and emotional harm.

Portee, 84 N.J. at 100.

The New Jersey Supreme Court has encouraged the "narrow application" of the Portee factors listed above in order to prevent the claim from becoming "too expansive and burdensome." Dunphy v. Gregor, 136 N.J. 99, 107 (1994). The Portee Court itself emphasized that narrow application of the factors set forth above was necessary because the Court did not intend to create a cause of action "for all emotional injuries to all the close relatives of the victim." Portee, supra, 84 N.J. at 99.

The Court took pains to define each of the elements with particularity. With respect to the third requirement [the observation issue], the Court held:

> The [third] requirement-that the plaintiff witness the incident which resulted in death or serious injury-is equally essential. We recognize that to deny recovery solely because the plaintiff was not subjected to a risk of physical harm would impose an arbitrary barrier that bears no relation to the injury to his basic emotional stability.

13

[Citations omitted]. Yet avoiding arbitrary distinctions does not entail that a cause of action should exist for all emotional injuries to all the close relatives of the victim. This expansive view would extend judicial redress far beyond the bounds of the emotional interest entitled to protection. To avoid imposing liability in excess of culpability, the scope of recovery must be circumscribed to negligent conduct which strikes at the plaintiff's basic emotional security.

Discovering the death or serious injury of an intimate family member will always be expected to threaten one's emotional welfare. Ordinarily, however, only a witness at the scene of the accident causing death or serious injury will suffer a traumatic sense of loss that may destroy his sense of security and cause severe emotional distress. As Justice Cardozo stated in his classic formulation, 'The risk reasonably to be perceived defines the duty to be obeyed.' [Citation omitted]. Such a risk of severe emotional distress is present when the plaintiff observes the accident at the scene. Without such perception, the threat of emotional injury is lessened and the justification for liability is fatally weakened. The law of negligence, while it redresses suffering wrongfully caused by others, must not itself inflict undue harm by imposing an unreasonably excessive measure of liability. Accordingly, we hold that observing the death or serious injury of another while it occurs is an essential element of a cause of action for the negligent infliction of emotional distress.

Id. at 99 (emphasis added).[1]

---

[1] For purposes of this motion, defendant Electrolux concedes a material factual dispute exists with respect to the first and second Portee elements. Defendant moves for summary judgment on the grounds that plaintiff is unable to satisfy the third and fourth elements under Portee

A.   **Plaintiff Cannot Establish That She Was Contemporaneously Aware of the Accident and, Therefore, Summary Judgment Should Be Granted**

Portee and its progeny require the contemporaneous observation of the accident and resulting injury in order to sustain a valid claim.   See Carey v. Lovett, 132 N.J. 44, 62 (1993) (ruling that father seeking to recover as bystander for malpractice that resulted in death of his child several days after the child's birth "must contemporaneously observe the malpractice and its effects on the victim"); Frame v. Kothari, 115 N.J. 638, 649, (1989) (requiring contemporaneous observation of both act of malpractice and fatal or gravely-injurious effects of that act on victim); Johnson v. Mountainside Hosp., 239 N.J. Super. 312, 327, (App. Div.) (holding that "a bystander may not recover damages for emotional distress unless he has been present and has observed the actual injury inflicted on a member of his family"), certif. denied, 122 N.J. 188 (1990); Lindenmuth v. Alperin, 197 N.J. Super. 385 (Law Div. 1984) (denying recovery for emotional distress of mother from death of her child three days after the child's birth where death was caused by doctor's misdiagnosis and the misdiagnosis is not an observable event); Vasilik v. Federbush, 327 N.J. Super. 6, 12 (App. Div. 1999).

The case of Frame v. Kothari, 115 N.J. 638 (1989) is instructive. Frame was a malpractice action in which plaintiffs brought their child to an emergency care facility after the child fell down a flight of stairs. Id. at 640. The treating doctor allegedly treated and released the child but failed to instruct the parents to watch for signs of head injury. Id. Later that same afternoon, the parents called the doctor complaining that the child's eyes were "pivoting around" in their sockets, but the doctor reportedly told them not to worry and instructed them to let him go back to sleep. Id. at 640-41. Four hours later, the parents tried to wake the child but found he was "moribound." Id. at 641. The child was rushed to the hospital where a blood clot was discovered. Id. Surgery was performed but the child died a few hours later. Id. The mother brought suit claiming she was "severely depressed and … suffer[ing] from nightmares and insomnia." Id. She consulted a psychiatrist, who diagnosed her condition as "a chronic post-traumatic stress disorder." Id. The doctor attributed her symptoms to a series of events beginning with the child's fall downstairs, extending through the observation of the pivoting motion of his eyes, and ending with the child's death. Id. "The psychiatrist was unable to separate one moment from the

16

next in establishing the symptoms that caused" the mother's
condition.  Id.  The Supreme Court held that in the context
of a malpractice claim, a family member could maintain an
emotional distress claim only where the "family member
witnesses the physician's malpractice, observes the effect
of the malpractice on the patient, and immediately connects
the malpractice with the injury…." Id. at 649.  In Frame,
the New Jersey Supreme Court continued in its discussion of
the third Portee factor -- the observation requirement --
stated:

> [In  Portee,]  [w]e  limited  recovery  "to
> negligent  conduct  which  strikes  at  the
> plaintiff's  basic  emotional  security,"
> recognizing that the discovery of the death
> or  serious  injury  of  an  intimate  family
> member will always be expected to threaten
> one's   emotional   welfare.   Ordinarily,
> however,  only  a  witness  at  the  scene  of  the
> accident  causing  death  or  serious  injury
> will  suffer  a  traumatic  sense  of  loss  that
> may destroy his sense of security and cause
> severe emotional distress.
>
> To  justify  recovery,  the  plaintiff  should
> observe   the   kind   of   result   that   is
> associated   with   the   aftermath   of   an
> accident,   such   as   bleeding,   traumatic
> injury, and cries of pain.  Recovery for the
> negligent  infliction  of  emotional  distress
> is   meant   to   cover   the   observation   of
> shocking  events  that  do  not  occur  in  the
> daily lives of most people. Merely being on
> the  scene  may  not  be  enough.   The  injury
> must be one that is susceptible to immediate
> sensory  perception,  and  the  plaintiff  must
> witness   the   victim   when   the   injury   is
> inflicted or immediately thereafter.

Id. at 643-44 (emphasis added) (internal citations omitted).

The Supreme Court emphasized again the point it made in Portee about the observation requirement as being necessary to guard against what it previously referred to as an "unreasonably excessive measure of liability:"

> In reaching that conclusion, we recognize that the evaluation of a family member's claim for emotional distress involves drawing lines. Whenever a court draws lines, it risks the criticism of arbitrariness. Drawing lines, however, is the business of the courts, and lines must be drawn to provide remedies for wrongs without exposing wrongdoers to unlimited liability. Our task is to draw the boundary of a claim that permits recovery for the added stress caused by medical misdiagnosis without unreasonably burdening the practice of medicine.

Id.

New Jersey courts have held that the Frame requirement of "immediate sensory perception" is not limited to malpractice cases. In Bischoff v. Kohlrenken, 185 N.J. Super. 548 (Law Div. 1982), for example, plaintiffs' 31-year old son was severely injured in an automobile accident. Id. at 551. Plaintiffs did not witness the accident but were with him at the hospital and observed as doctors worked in vain to save his life. Id. at 549-50. The trial court dismissed plaintiffs' emotional distress

claim and held that observation of the death or serious injury while it occurs is an "essential element" of recovery for negligent infliction of emotional distress. Id. at 551.

In making its ruling, the Bischoff Court looked to case law from other states, notably California. Id. at 552. The court relied heavily upon the California case of Powers v. Sissoev, 39 Cal. App. 3d 865 (D. Ct. App. 1974), in which "a child was injured in an automobile accident and taken to a hospital. Her mother, who had not witnessed the accident, did not see the child until 30 or 60 minutes after the event and thereafter observed her deteriorating condition.    The court held that no recovery would be permitted since the mother's shock was not contemporaneous with the accident and arose from circumstances not materially different from those undergone by every parent whose child has been injured in a non-observed and preceding accident." Id.

There are few exceptions to the Frame requirement of "contemporaneous observation," none of which apply to the facts of this case.    The first case to recognize an exception to the contemporaneous observation requirement was Carey v. Lovett, 132 N.J. 44 (N.J. 1993), which involved emotional distress claims of both parents

following the death of their 10-day old baby.  Id. at 49.
The obstetrician had informed the parents that the baby had
died inutero.  Id.  Plaintiff came to the doctor's office
expecting to give birth to a still born baby.  Id. at 52.
Instead, the child was born alive and survived for 10 days.
Both parents sued the doctor for malpractice and sought
recover for their separate emotional distress claim.  Id.
at 53-54.

   The Court distinguished the claims of the mother and
the father and held that in a situation involving alleged
malpractice occurring during childbirth, the Portee/Frame
"contemporaneous observation" requirement would not be
applied to the mother's claims, based upon the "unique
relationship" and role of the mother to the new born baby:

> The unique relationship between a pregnant
> woman and her baby mitigates the need for
> the additional requirements of an "indirect
> claim" for emotional distress. Bound by
> physical and emotional ties, mother and baby
> are so closely joined that we need not
> require that the mother be "shocked" by
> malpractice on the baby. The maternal-fetal
> relationship bespeaks the genuineness of an
> otherwise-valid    claim    for    emotional
> distress. To the extent that lack of
> preparation for the birth of a live, but
> impaired, child is relevant, it is subsumed
> in the requirement that the emotional
> distress be severe. That requirement
> provides a sufficient guaranty of
> genuineness to substitute for physical
> injury to the claimant, which until now has

> been an element of a direct claim for
> emotional distress.
>
> A further consideration counsels against
> requiring that the mother be
> contemporaneously aware of the malpractice
> and the injury to her fetus. A woman may
> choose not to be anesthetized because of her
> concern for the effect on her baby or
> because of her desire to participate
> consciously in the child's birth. A
> requirement of contemporaneous observation
> could disserve both objectives by providing
> physicians with an incentive to anesthetize
> the woman. To require that the mother be
> contemporaneously aware of the
> obstetrician's malpractice and the injury to
> the fetus is both unnecessary and unwise.

Id. at 60-61 (internal citations omitted).

Significantly, however, the Court held that the

"contemporaneous observation" requirement would still

apply to the father's claims:

> Because of the inherent difference in the
> role of the father and mother we believe
> that the father's claim should be limited by
> the requirements pertaining to other forms
> of medical malpractice. Thus, the father
> must contemporaneously observe the
> malpractice and its effects on the victim.

Id. at 61. (citing Frame, supra, 115 N.J. at 643).

In Ortiz v. John D. Pittenger Builder, Inc., 382 N.J.

Super. 552 (Law Div. 2004), a tragic fire resulted in the

death of a 5 year old girl. Id. at 53. The girl's mother

and grandmother were home at the time and fought heroically

to save all of the children in the house from the fire.

Id. at 554-56. Despite their frantic efforts, they were

not able to find the 5 year old in the fire and eventually they fled the fire themselves. Id. at 556. They brought suit against the builder whose negligence allegedly caused the fire. Id. at 554. One element of their claim was for their emotional distress arising from the death of the little girl. Id. The question before the court was whether a family member could recover under Portee where they did not actually see the child die in the fire. The court ruled that the "contemporaneous observation" requirement was satisfied by plaintiffs' "sensory awareness" of the event and its consequences:

> This court adopts the "modern view [where] actual observation of the accident is not required if there is [as here] otherwise an experiential perception of it." [citation omitted]. In doing so, this court follows the lead of the California courts and extends the Portee third prong of observation to include being "sensorially aware" of a family member who is within a burning building.

Id. at 563.

In this case, plaintiff Tamika Fitzgerald admits that she did not contemporaneously see or hear the accident, did not witness her son suffering, and did not come upon the scene until after her son had lost consciousness and, likely, after he had already passed away. According to plaintiff's testimony, she and her daughter were upstairs

in the house while decedent was downstairs doing various chores, including "cleaning the kitchen," "waiting for the laundry to dry," and "walking the dog."  Fitzgerald Dep. at 94:22-95:8.

Plaintiff admits that she did not see or hear the accident and was therefore not "sensorially aware" of the accident when it occurred:

Q.   How did you become aware that an incident occurred involving your son?

A.   I was calling to my son, but he didn't answer.   I came down and started walking down the steps and I called to him again and I figured maybe he was outside walking the dog or, you know, just playing. So I continued to walk down the steps and I saw him.

Q.   Before you saw him, had you heard any sounds?

A.   No.

Q.   So you did not hear or see anything that you now think was related to the incident?

A.   No.

Q.   So the first time that you became aware that an incident occurred was when you saw him after you came downstairs to see where he was?

A.   Yes.

Fitzgerald Dep. at 95:15-96:10.

23

Plaintiff further admits she did not observe "the kind of result that is associated with the aftermath of an accident, such as bleeding, traumatic injury, and cries of pain." Frame v. Kothari, supra, 115 N.J. at 643-44. Plaintiff testified that by the time she found her son's body, the washing machine was off, and he was unconscious, unresponsive and with no signs of breath or pulse:

    Q.    Was he breathing?

    A.    No.

    Q.    He was not breathing?

    A.    No.

    Q.    Did you check for a pulse?

    A.    Yes.

    Q.    How did you check for a pulse?

    A.    I put my fingers on his arm and on his
          neck.

    Q.    Did you feel a pulse?

    A.    No.

    Q.    Did you observe at this time any other
          injuries to his body other than to the
          marks on his neck?

    A.    I don't recall. I think his mouth might
          have been red, but I don't recall.

Id. at 108:15-109:5. Plaintiff's medical expert's report opined that decedent would have lost all consciousness between 10 seconds and 1 minute of getting his sleeve

caught in the washer.  (See Osterman Aff. at Exhibit H, p. 5).  Once the paramedics arrived, plaintiff testified that she did not witness any of the efforts to resuscitate her son because she had been instructed to go upstairs, so the paramedics could have more room to work.

> Q.   How long were they in the house for?
>
> A.   I don't know.
>
> Q.   At some point they took your son out of the house?
>
> A.   Yes.
>
> Q.   During the whole time was your son still positioned on the floor in front of the washer/dryer or did they move him?
>
> A.   *I don't know because I was up on the landing and I couldn't see.*

Fitzgerald Dep. at 113:4-22 (emphasis added).

The facts of this case are, at best, and giving plaintiff the benefit of all inferences, indistinguishable from the long line of cases discussed above holding that coming upon an accident scene after an accident is insufficient to support a Portee claim.  See Frame v. Kothari, 115 N.J. 638, 649 (1989); Johnson v. Mountainside Hosp., 239 N.J. Super. 312, 327 (App. Div.), certif. denied, 122 N.J. 188 (1990); Lindenmuth v. Alperin, 197 N.J. Super. 385 (Law Div. 1984); Vasilik v. Federbush, 327

N.J. Super. 6, 12 (App. Div. 1999); Mealey v. Marella, 328 N.J. Super. 129, 140-41 (Law Div. 1999), overruled on other grounds; Tynana v. Curzi, 332 N.J. Super. 267 (2000). Plaintiff admits she did not witness the accident, did not observe her son bleeding, suffering, or crying out in any pain. She came upon his body at the accident scene at some point after the accident, at a time when he was not breathing, bleeding or conscious and in all likelihood, was already dead. Although she was in the house, she did not witness first hand the paramedic's efforts to resuscitate her son, having been asked to go upstairs and stay out of the way. None of the factors that justified a lessening of the Frame "contemporaneous observation" requirement are present here. This in not like the "unique" situation of a mother giving birth to a child, whose ability to "observe" the actual malpractice of her doctor is affected by anesthesia nor is it the situation of a parent whose ability to see her child burning in a fire is masked by the smoke and fire itself.

In the absence of evidence that plaintiff was present and witnessed the accident, the infliction of his fatal injuries, and any active suffering by decedent, or that she was otherwise "sensorially aware" of the accident as it was occurring, she is unable, as a matter of law, to satisfy

the third element of her Portee claim and, accordingly, her
emotional distress claim should be dismissed.

**B.   Plaintiff Cannot Establish the Requisite Severity
of an Emotional Distress Claim**

Even if plaintiff were able to satisfy Portee's third
element, her claim should still be dismissed as she is
unable to present evidence of a material factual dispute
with respect to the fourth Portee element. In order to
obtain recovery for an indirect claim of emotional
distress, plaintiff must establish that she suffered
"severe emotional distress." Severe emotional distress has
been defined as distress that is "so severe that it
resulted in physical manifestations or . . . destroyed [the
plaintiff's] basic emotional security." Cary v. Lovett,
132 N.J. 44, 62 (1993). The emotional distress has to
affect the plaintiff's "mental and emotional stability."
Portee, supra, 84 N.J. at 100-01.

Although physical manifestations are not necessary,
the distress must be "severe and substantial . . . not
merely transitory but rather [having] a discernible effect
on the plaintiff's ability to function normally, either
physically or psychologically, on a daily basis." Tarr v.
Bob Ciasulli's Mack Auto Mall, Inc., 360 N.J. Super. 265,
271 (App. Div.), aff'd in part, rev'd in part, 181 N.J.

70, (2004).   Liability will only be imposed if the injury is "sufficiently palpable, severe, or enduring." Decker v. Princeton Packet, Inc., 116 N.J. 418, 431 (1989).   "Mere aggravation, embarrassment, an unspecified number of headaches, loss of sleep, and lack of interference with the every day routine do not, as a matter of law constitute severe emotional distress." Maldonado v. Leeds, 374 N.J. Super. 523, 529 (App. Div. 2005).

The question of whether or not a plaintiff has made out a claim for emotional distress is a question of both fact and law.   Id.   "The court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." Id.

In Boryszewski v. Burke, 380 N.J. Super. 361 (App. Div. 2005), the appellate division upheld the jury's verdict of $5 million for indirect infliction of emotional distress to each of three children that witnessed the death of their mother when a tire crushed the roof of their car. Id. at 368-69.   The appellate division found there was sufficient evidence in the record to support a finding that the boys suffered severe emotional distress.   Id. at 402-403.   All the boys sought counseling immediately after the event and continued to seek treatment, they all suffered nightmares, sought comfort by sleeping with their father,

28

they all had fears about driving and although all the boys
dealt with the death differently and suffered differently,
the appellate division found that their emotional distress
satisfied the legal standard for "severe emotional
distress." Id. at 397-401.

In contrast, the Appellate Division in Trisuzzi v.
Tabatchnik, 285 N.J. Super. 15 (App. Div. 1995), found as a
matter of law that plaintiff's alleged psychological injury
was insufficient to constitute compensable emotional
distress. Id. at 27. Plaintiff witnessed a vicious dog
attack her husband when they were walking with their
daughter. Id. After the attack, plaintiff saw a
psychologist for a brief period of time, had a phobia of
unleaded dogs, never walked or bicycled alone and avoided
the area of the attack. Id. at 26. Her treating therapist
opined that plaintiff had "nightmares, anticipatory anxiety
and feelings of guilt because she became paralyzed with
fear at the time of the attack and was unable to protect
her daughter." Id. The Appellate Division affirmed the
trial judge's conclusion "that this distress was not
sufficiently severe to justify submitting the matter to the
jury." Id. at 27. Significant to the Appellate Division's
holding was the relatively minor impact of plaintiff's
psychological maladies upon her life. Id.

The threshold of distress that a plaintiff must prove she has suffered to recover under a theory of negligent infliction of emotional distress is high.  The courts have rejected emotional distress claims as a matter of law for failure to meet the requisite high level of mental anguish. Decker v. Princeton Packet, Inc., 116 N.J. 418, 431 (1989); Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 368 (1988) (aggravation, embarrassment, headaches and loss of sleep do not constitute severe emotional distress as a matter of law); Rocci v. MacDonald-Cartier, 323 N.J. Super. 18 (App. Div. 1999).  With regard to the court's role in distinguishing compensable claims for negligent infliction of emotional distress from those on which there may be no recovery, the New Jersey Supreme Court has observed that "unless a plaintiff's alleged distress is truly genuine and substantial, the tort of negligent infliction should not be broadened to permit recovery of damages.  Hence, the genuineness and severity of emotional distress can present threshold questions of law." Decker, 116 N.J. at 430.

New Jersey courts have consistently held that a plaintiff is not entitled to recover damages for the normal

distress associated with the loss of a loved one.[2]   For example in Ahn v. Kim, 145 N.J. 423 (1996), the court rejected plaintiff's claims for the negligent infliction of emotional distress in connection with the disappearance of her husband from a psychiatric hospital noting that it could not "distinguish her reaction from that if other spouses who sustain the loss of a husband or wife." Id. at 437.  See also Wolfe v. State Farm Ins. Co., 224 N.J. Super. 348, 353 (App. Div. 1988) (holding that "such emotional distress is not the equivalent of grief from losing a loved one, but is inflicted by the thought of seeing a loved one suffer or die or if seeing efforts to revive her being unsuccessful").

In Carey v. Lovett, supra, 132 N.J. 44 (1993), the New Jersey Supreme Court found that a jury verdict awarding a sizeable verdict to the mother and father for emotional distress following the death of a child in a medical malpractice case was excessive and against the weight of the evidence, where the evidence indicated that plaintiffs had been seen by a therapist multiple times, but there was an absence of "any evidence of psychiatric hospitalization

---

[2] Governor Corzine recently vetoed a bill that would have amended the New Jersey Wrongful Death Act to permit recovery for "mental anguish and emotional pain and suffering" in the case of a surviving spouse, child, father or mother. S176A.  The Governor's veto message noted  that "[u]nlimited damages based on emotional anguish or pain and suffering could have a significant impact on state and local budgets."

or significant interference with the lifestyle or employment relationships of either Mr. or Mrs. Carey." Id. at 66-67.

In this case, plaintiff has made only vague, unsubstantiated complaints of sorrow and depression, indistinguishable from the normal grief reaction described above. Plaintiff admits she did not immediately seek medical or psychiatric attention and returned to work soon after the accident. When asked by Dr. Wong to list the ways her emotional state has interfered with the activities of daily living, plaintiff identified only "sleeping" as something she did less often or less well since the accident. Plaintiff has been able to continue working since the accident and has been able to continue functioning as a mother to her other child. Plaintiff has also submitted the expert report of Dr. Cheryl Wong, a psychiatrist who saw plaintiff one time, for about an hour. Plaintiff has never been treated by any psychiatrist or counselor and has not been evaluated by anyone unconnected to this litigation.

Defendant has separately moved in limine to preclude the testimony of Dr. Wong, based on Federal Rule of Evidence 702 and as a sanction for the spoliation of evidence (the intentional destruction of Dr. Wong's office

32

notes – the only contemporaneous record of her conversation with plaintiff). Even if Dr. Wong's testimony is admitted into evidence, plaintiff is still unable to satisfy the fourth prong of Portee, with respect to the severity of her alleged emotional distress claim. While no one doubts plaintiff's grief and suffering following the death of her son, no evidence has been offered as to any physical manifestations of plaintiff's emotional distress. Simply put, there is no evidence that would permit a jury to distinguish her reaction from that of any other mother who sustains the loss of a child.

Accordingly, plaintiff has failed to satisfy the fourth element of a Portee claim and her emotional distress claim should be dismissed.

## III. PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES

Defendant is entitled to summary judgment with respect to plaintiff's claim for punitive damages because there is no evidence of any act or omission by this defendant that was actuated by actual malice or accompanied by a wanton and willful disregard of persons who might be harmed by those acts or omissions.

N.J.S.A. 2A:15-5.12 provides that:

> a.   Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm

suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.  This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

"Actual malice" is defined by the Act as "an intentional wrongdoing in the sense of an evil-minded act." N.J.S.A. 2A:15-5.10.  "Wanton and willful disregard" is defined as "a deliberate act or omission with knowledge of a high risk of probability of harm to another and reckless indifference to the consequences of such an act or omission."  Id.  The Act further provides a non-exhaustive list of factors that a fact finder must consider in deciding whether to award punitive damages:

(1)  The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
(2)  The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
(3)  The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
(4)  The duration of the conduct or any concealment of it by the defendant

N.J.S.A. 2A:15-5.12 (b).  The legislative purpose of the Act was remedial, it was intended to establish more restrictive standards with regard to the awarding

34

of punitive damages.   N.J.S.A. 2A:15-5.9; See Pavlova
v. Mint Management Corp., 375 N.J. Super. 397, 404
(App. Div. 2005), cert. denied, 184 N.J. 211 (2005).

New Jersey courts applying the Act have enforced a
rigorous and high standard with respect to punitive damage
claims. "[C]ircumstances of aggravation and outrage, beyond
the simple commission of a tort, are required for an award
of punitive damages." Pavlova v. Mint Management Corp.,
375 N.J. Super. 397, 404 (App. Div. 2005), cert. denied,
184 N.J. 211 (2005). Mere negligence, no matter how gross,
is not a sufficient basis for an award of punitive damages.
Smith v. Whitaker, 160 N.J. 221 (1999).  Plaintiff must
prove "a deliberate act or omission with knowledge of a
high degree of probability of harm and reckless
indifference to consequences.   Pavola, supra, 375 N.J.
Super. at 405; see also Berg v. Reaction Motors, 37 N.J.
396, 414 (1962).  This higher standard is necessary because
the purpose of punitive damages is to punish a wrongdoer
and deter others.  Id.  Summary judgment must be granted
where "plaintiff has not provided a prima facie basis for
the award of punitive damages." See Parks v. Pep Boys, 282
N.J. Super. 1, 18 (App. Div. 1995).

The case of Pavlova v. Mint Management Corp., 375 N.J.
Super. 397, 404 (App. Div. 2005), cert. denied, 184 N.J.

211 (2005), is directly on point. Pavlova arose out of a fatal fire in a senior citizen apartment complex. Id. at 400. A towel hanging on a towel rack in a bathroom ignited from contact with a wall mounted heater. Id. The heaters had a warning on its cover warning the user not to place anything on or in front of the heater. Id. at 401. Despite this warning, the bathrooms throughout the complex had towel bars near and sometimes directly above the wall mounted heaters. Id. There had been two "minor" fires involving similar wall mounted units in the apartment building previously, both involving the placement of combustibles directly on or in front of the heaters. Id. at 401-02. Following the second fire, the fire marshal verbally recommended to the building owner that the towel bars should be moved away from the heaters, but if this was not possible, the fire marshal recommended that residents be "made aware of the safety requirements when it comes to storing material too close to the heater in the bathroom." Id. at 402. The building owner posted notices in the common area and held a safety meeting with the residents. Id. Unfortunately, the sign was only up for three months and the decedent moved into the building long after the meeting was held. Id. Despite the fire chief's recommendation, the fire department never actually ordered

36

defendant to move the towel racks, although they clearly
had the authority to do so.    Id.    Further, the evidence
established that building was inspected every year for
twenty years and was never cited for any fire code
violations.    Id.

Based on these facts, the defendant building owner
moved for partial summary judgment dismissing plaintiff's
punitive damage claims.    Id. at 403.    The trial court
denied defendants motion on the grounds that there was a
factual dispute.    Id.    The Appellate Division granted leave
to appeal and eventually reversed the trial court's ruling.
Id.    In doing so, the Appellate Division found, as a matter
of law, that plaintiff had failed to produce sufficient
evidence of malicious intent or reckless indifference.    Id.
at 407.    Critical to the court's opinion was that the
building had never been cited for any fire code violations
and had never been ordered to move the towel racks.    Id. at
408.    Rather, the fire marshal's recommendation was offered
as the preferred of two possible alternatives for
addressing the problem.    Id.    "Even then, defendant did not
ignore the suggestions, but rather complied by choosing the
alternative course action recommended.    Thus, defendant
warned residents by posting a notice on a common bulletin
board and organized an informational meeting of the

37

residents with fire department officials." Id.  The court distinguished a claim that defendant had done nothing at all in response to the fire chief's recommendation from the situation at hand where defendant had done *something,* albeit not as much as plaintiff would have liked.  Id. According to the Court, "[t]he fact that defendant could have better monitored implementation of this policy by ensuring continual notification to new residents such as decedent may arguably amount to negligence or even gross negligence, but, in our view, it does not amount to the level of wanton and willful disregard of the likelihood or high probability of resultant serious harm." Id.

The facts of this case are strikingly similar and should therefore produce a similar result.  It is undisputed that the applicable product standard requires some form of guard against operating the machine in the spin cycle with the lid open.  Two accepted methods are possible under the standard: either a brake that stops the spinning agitator within seven seconds of opening the lid or a lid lock mechanism that locks the lid when it is in spin cycle.  Electrolux chose to incorporate the later design.  According to its engineer, Fred Pauk, Electrolux considered this design preferable to the design that would brake the spinning drum because brake pads can wear out

over time and eventually need to be replaced in order for
the washer to stay in conformance with the standard.    Pauk
Dep. at 38:16-39:18.

Even the CPSC did not find any violations of the UL
standard.    According to the CPSC's investigation report,
manufacturers are required to provide one of two safety
options to top-loading washing machines.

> The UL standard (UL 2157 Electric Clothes
> Washing Machines and Extractors) requires
> manufacturers to provide one of two safety
> options during the spin cycle on a top-loading,
> centrifugal-extraction machine.    The manufacturer
> can either;
>
> a)    provide a means to reduce the likelihood of
>        opening the loading/unloading door or lid
>        during operation, or
>
> b)    provide an interlock that removes the
>        driving force from the spinning basket and
>        stops the movement within 7 seconds if the
>        lid is raised more than 50.8mm (2 inches).
>
>
> The incident machine provides a switch that
> prevents the lid from being raised during the
> spin cycle, option a) of the UL standard . . .
> because this model uses a locking mechanism that
> prevents access to the spinning bucket, there is
> no requirement for the spinning bucket to come to
> a stop within 7 seconds.

See Osterman Aff. at Exhibit D.

Plaintiff and her expert may have preferred that
defendant had made a different design choice, but there is
absolutely nothing in the record that would support a

finding that defendant's design choice was malicious or motivated by actual malice or a reckless indifference to safety. Compliance with an applicable and relevant safety standard ought to immunize a defendant from any finding of punitive liability, as a matter of law.

As in Pavlova, this is not a situation in which defendant chose to do nothing. The CPSC was obviously satisfied that defendant's product complied with the applicable standard. The product was never recalled, although the CPSC obviously had the authority to do so, had it found that the product contained a defect or posed an unreasonable risk of serious harm to consumers. At best, plaintiff's argument is that defendant's product should have incorporated a *different* safety feature or *better* warnings. At most, such conduct is negligent, not malicious.

Plaintiff has not presented anything to indicate that defendant did anything that was malicious, or willfully and wantonly reckless. Therefore, plaintiff's punitive damages claim should be dismissed.

## CONCLUSION

Accordingly, defendant's motion for partial summary judgment should be granted and plaintiff's emotional distress and punitive damages claim should be dismissed.

**GOLDBERG SEGALLA LLP**
Attorneys for Defendant
Electrolux Home Products, Inc.

By: _____
David S. Osterman
A Member of the Firm

Dated: 2/25/08

41