**EXHIBIT A**

1

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY

                    - - - - -

FRANK YOUNG, by Natural)
Father and             )
Administrator Ad       )
Prosequendum of the    )
Estate of DASHAWN      )
TAHREE YOUNG, and FRANK)
YOUNG, individually,   )
                       )
          Plaintiffs,  )
                       )
          vs.          )  Civil Action
                       )  No. 2:05-cv-964
FRIGIDAIRE COMPANY,    )
ELECTROLUX, WHITE      )
CONSOLIDATED           )
INDUSTRIES, JOHN DOE   )
1-10                   )
(fictitious names), ABC)
CORP, 1-10 (fictitious )
names), PETER POE 1-10 )
(fictitious names) AND )
XYZ CORP. 1-10         )
(fictitious names),    )
                       )
          Defendants.  )
```

- - - - -

DEPOSITION OF CYRIL H. WECHT, M.D, J.D.

- - - - -

REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY

- - - - -

Condensed Copy

**2**

1  DEPOSITION OF CYRIL H. WECHT, M.D., J.D.
2  a witness herein, called by the Defendant,
3  Electrolux Home Products, Inc., for
4  examination, taken pursuant to the Federal
5  Rules of Civil Procedure, by and before
6  Monica R. Chandler, a Professional Court
7  Reporter and Notary Public in and for the
8  Commonwealth of Pennsylvania, at
9  the offices of Cyril H. Wecht, M.D., J.D.,
10  1119 Penn Avenue, Suite 404, Pittsburgh,
11  Pennsylvania, on Wednesday, January 31, 2007,
12  at 11:20 a.m.
13      - - - - -
14  COUNSEL PRESENT:
15  For the Plaintiffs: Law Offices of Frank J.
        Zazzaro
16      by Bridget Saro, Esq.
17  For the Defendant,
    Electrolux Home Products,
18  Inc. (improperly plead as
    Frigidaire, Electrolux and
19  White Consolidated Industries):
20      Goldberg Segalla, LLP
        by David S. Osterman, Esq.
21
        - - - - -
22
23
24
25

**3**

1          I N D E X
2          - - - - -
3
4    WITNESS:  CYRIL H. WECHT, M.D., J.D.
5
6  E X A M I N A T I O N:          PAGE
7
8  BY MR. OSTERMAN              4, 79
9  BY MS. SARO                 75
10
11  E X H I B I T S:
12
13  DR. WECHT DEPOSITION NOS. 1-5        4
14  DR. WECHT DEPOSITION NO. 6         33
15  DR. WECHT DEPOSITION NO. 7         34
16
17
18
19
20
21
22
23
24
25

**4**

1          P R O C E E D I N G S
2          - - - - -
3          (Wecht Exhibit Nos. 1 through
4  5 were marked for identification.)
5          CYRIL H. WECHT, M.D., J.D.
6  a witness herein, having been first duly sworn,
7  was examined and testified as follows:
8          EXAMINATION
9  BY MR. OSTERMAN:
10    Q.   Dr. Wecht, my name is
11  David Osterman.  I'm a partner in the law firm
12  of Goldberg Segalla.  I represent the
13  defendants in the case of Frank Young on behalf
14  of the Estate of Dashawn Young versus
15  Frigidaire and the Electrolux defendants.
16         I'm going to be asking you some
17  questions today.  I know you're familiar with
18  the procedure for a deposition, so I'm just
19  going to jump right into my questions.
20         Have you seen previously what we
21  have marked as Exhibit No. 1 which is the depo
22  notice which asked you to bring certain
23  materials with you to the deposition?  Have you
24  seen that previously?
25    A.   I don't think I have -- no, because

**5**

1  I see my file marked with correspondence where
2  I would put such things.  No, I do not, I have
3  not.
4    Q.   We'll come back to this in a second.
5  We've marked as Exhibit 2 which is a copy of
6  what your staff, I guess, has provided to us on
7  the table.  I have been provided with a CV
8  previously, but I just marked one on the table
9  on the assumption that that is the most recent
10  current and up-to-date CV.
11    A.   Yes.  It is the most recent that has
12  been typed.  I'm working on a revision and
13  there are additions, articles, some
14  organizations, affiliations and so on, but that
15  is the only one I have.
16    Q.   Are you in a position or when do you
17  anticipate to be in a position to provide that
18  updated CV rather than me going through and
19  asking you to detail all of the changes to it?
20    A.   As a matter of fact, I'm trying to
21  get that finished up.  I think by mid February
22  I want to have it, and I expect to have it by
23  mid February.
24    Q.   Are there any publications that
25  you've authored that you think would be

2 (Pages 2 to 5)

**6**

1 particularly relevant to the issues in this
2 case?
3    A.   No.
4    Q.   Any professional associations or
5 employment that you think is particularly
6 relevant to the issues in this case?
7    A.   No.
8         MR. OSTERMAN:  Can we have an
9 agreement, counsel, that you will provide me
10 with a copy of the updated CV?
11        MS. SARO:  We will follow up
12 with Dr. Wecht and get that updated CV.
13   Q.   We have marked as Exhibit 3 the list
14 of trial testimony and depositions.  Is this
15 the most recent and up-to-date list that you
16 were able to compile?
17   A.   Yes, but, obviously, there is some
18 things to be added.  Again, nothing of any kind
19 that I can think of that relates to the issues
20 in this case.  Most of the cases to be added
21 would be homicide trial in which I testified in
22 local counties.  For example, there have been
23 four in the past two weeks in four different
24 counties.  There was a wrongful death case in
25 Ohio, a malpractice case in West Virginia, a

**7**

1 criminal case in West Virginia.  Those are the
2 only three that come to mind aside from the
3 county homicide cases in which I testified as a
4 forensic pathologist who had performed the
5 autopsies.  So they will all be added, but
6 there is nothing in any of those cases that
7 touches upon the issues that I'm aware of in
8 this case.
9    Q.   On the list here that's marked as
10 Exhibit 3, to the best of your recollection,
11 did any of those cases involve civil lawsuits
12 in which the manner of death was alleged to be
13 some form of asphyxiation?
14   A.   Gee, I would really have to spend
15 some time -- I can tell you nothing at all like
16 the physical circumstances of this case with
17 this kind of piece of machinery or anything
18 else.  Asphyxia is such a wide umbrella of
19 drowning, mudslides, other industrial kinds of
20 situations.  It's very likely that there would
21 have been over the years that I started this
22 business.  I forget when I started, 10, 12
23 years ago.  It's very likely, but I can't
24 remember offhand any.  I know there is nothing
25 that involves a washing machine or anything

**8**

1 like a washing machine.
2    Q.   As you sit here today, can you
3 recall ever offering an opinion or testifying
4 regarding an opinion as to whether someone
5 experienced conscious pain and suffering during
6 the course of strangulation or asphyxiation?
7    A.   I believe I have.  I think it's come
8 up some times in homicide cases over the years,
9 questions about whether the person being
10 strangled could have done certain things and so
11 on.  I think it has come up some times in that
12 context.  I know it's come up in a variety of
13 cases dealing with asphyxiation.  I'm trying to
14 think specifically with strangulation.  Well, I
15 think there was a case in Massachusetts with an
16 elderly woman patient in a hospital bed and
17 somehow she got entangled in the privacy
18 curtain and strangled, and that was a
19 malpractice type case against, I guess, the
20 hospital, and I do believe that conscious pain
21 and suffering would have been addressed in that
22 case.  That was four or five --
23   Q.   Do you want to look at the list?
24   A.   Here it is.  Hildegarde Palmer,
25 2000.  Here it is.  Yes.  I remember the

**9**

1 attorney's name.
2    Q.   It's on page 10 of Exhibit 3.
3 Abigail Williams was the name of the --
4    A.   Plaintiff's attorney who had
5 consulted me.
6    Q.   And in that case you had been
7 retained by the plaintiff's attorney?
8    A.   Yes.
9    Q.   Did that go to trial or deposition?
10   A.   Yes, and I testified there in
11 Massachusetts.
12   Q.   It says here Worcester,
13 Pennsylvania?
14   A.   Oh, really?  It shouldn't be.
15        MR. OSTERMAN:  Let the record
16 reflect that you made a handwritten change to
17 the document.
18   A.   Yes.  It is Worcester, Mass.
19   Q.   As you sit here today, are you able
20 to recall any other such cases in which you
21 testified?
22   A.   Right now I can't.  I want to say
23 that it is possible, and I will think about it.
24 There have been a couple of cases.  I know I
25 have had a couple of cases that I have been

3 (Pages 6 to 9)

14

1 discussed within the report.
2    Q.    Is everything that you did and
3 reviewed in connection with this case listed
4 and described in the four corners of your
5 January 17, 2006 report and the February 1st,
6 supplement?
7    A.    Yes.  I think I make reference to
8 the statements, to the detectives, to the
9 deposition of this boy's mother, the autopsy
10 report and then an expert report of someone
11 that have been consulted by the plaintiff.  So
12 I think that I make reference to those, and I
13 have nothing else.  Oh, and I think I also make
14 reference to photos which I did receive.
15    Q.    Do you have the photos with you?
16    A.    Yes.  I brought the copies of the
17 photos that had been sent to me.  Everything is
18 here.
19    Q.    Can you pull out the photos?
20    A.    Yes.
21    Q.    Are these the actual photos that you
22 were provided?
23    A.    That is what was sent to me.
24    Q.    And this is all you've reviewed in
25 terms of photos?

15

1    A.    That's correct.
2    Q.    And these are black and white copies
3 of -- black and white xerox copies of the
4 photographs?
5    A.    Yes.
6    Q.    So I take it then you never saw the
7 originals or at least colored copies of photos?
8    A.    I have not.
9    Q.    Have you ever actually spoken with
10 the medical examiner in connection with this
11 case?
12    A.    No.
13    Q.    Reviewed any other deposition
14 transcripts, other than the deposition of
15 Tameika Fitzgerald?
16    A.    No.  That is the only one that was
17 sent to me.
18    Q.    You told me you have no opinions
19 regarding the design or manufacturer of the
20 washing machine in particular; correct?
21    A.    That's correct.
22    Q.    Do you have any understanding as to
23 how the washing machine worked and in
24 particular how the lid lock mechanism worked in
25 relation to the starting, stopping machine?

16

1    A.    Only from what I read that there is
2 a lid lock which I understand to mean that when
3 the spindle is turning, the actual central
4 working device, that one cannot open the lid.
5 They call it a lid lock.  Then some discussion
6 about if it is open -- oh, no.  When you try to
7 open it, it takes 25 to 35 seconds or something
8 like that for it to stop.  That was I think
9 in -- I'm just quoting what the gentleman had
10 said in his report.
11    Q.    You are talking about the gentleman
12 from the Consumer Product Safety Commission?
13    A.    Yes.  Thank you.  That's about it,
14 and then there was an instruction that I quoted
15 in my report, "Close lid.  Washer does not
16 advance into spin cycle unless lid is closed.
17 For your safety, lid automatically locks during
18 spin portions of each cycle.  Lid automatically
19 unlocks approximately one minute after cycle
20 ends," and I quoted.  I just picked that up.  I
21 think that was said to be an instruction on the
22 undersurface of the washing machine's lid.
23    Q.    Is it your understanding that the
24 washing machine worked as it was designed to
25 work in terms of the lid lock mechanism?

17

1         MS. SARO:  Just note my
2 objection to the form.
3    A.    I was just going to say I would not
4 even answer that.  Not to be evasive, but I
5 think that I really have no understanding of
6 whether it worked the way it was suppose to or
7 not.  I think that gets into the area of the
8 equipment and the evaluation and inspection of
9 that equipment by different people.  I really
10 have no knowledge.  I mean, I don't even have
11 any personal knowledge from my own home.
12    Q.    Let me make sure I'm clear on this,
13 and then I'll move on to a different subject.
14 You have no opinion one way or the other as to
15 whether the lid lock mechanism was, in fact,
16 working as it was at least intended to work?
17         MS. SARO:  Just note my
18 objection to form.
19    Q.    Is that a fair statement?
20    A.    Yes, that's correct.
21    Q.    Do you have any understanding as to
22 the height of the washing machine?
23    A.    Just from the pictures a little bit,
24 and kind of I guess in relationship to this
25 boy's height of five feet five and a half

5 (Pages 14 to 17)

18

1 inches. I guess I don't have a measurement
2 that I recall given to me. I think in my
3 mind's eye I envisioned it to be maybe
4 something about a foot higher than the surface
5 of this table from the floor. So I'm about
6 five whatever I am. I used to be 5'10", 5'9".
7 What am I doing here? About one, two, three.
8 I don't know maybe about three and a half, four
9 feet, probably closer to four feet, something
10 like that, but I don't have an exact
11 measurement.
12    Q.    You don't have an exact measurement,
13 but you assume it to be or your impression is
14 that it's between three and a half to four feet
15 tall?
16    A.    Something like that, yes. Yes,
17 somewhere around there.
18    Q.    In forming your opinions did you
19 have any understanding as to how fast it would
20 spin in the spin cycle?
21    A.    No.
22    Q.    Do you have and did you make any
23 assumptions in coming to your opinions, did you
24 have any information as to how long it would
25 take for it to get to full speed in the spin

19

1 cycle?
2    A.    No.
3    Q.    Do you know and did you make any
4 assumptions in coming to your opinions as to
5 whether the unit could start in the spin cycle
6 with the lid open?
7    A.    Inferentially from the information
8 given, it was my understanding that it would
9 not. That relates to a question and an answer
10 I gave a couple of minutes ago in which I read
11 what the machine instructions say that the
12 washer does not advance into the spin cycle
13 unless lid is closed. I'm just parroting what
14 I read.
15    Q.    Now, in terms of the mechanics of
16 how this accident happened, do you have an
17 opinion as to what -- let me back up. Do you
18 have an opinion as to how the machine got
19 started into the spin cycle?
20    A.    No.
21    Q.    Do you agree that in order to get
22 into the spin cycle, that he would have had to
23 have bypassed the lid lock device by somehow
24 sticking something in to depress the lid lock
25 lever?

20

1    MS. SARO:  Object to the form
2 for several reasons.
3    A.    I have no knowledge of that, and I
4 would express no opinion. I think that gets to
5 the whole question of how it works, how it
6 might not have worked properly, how it might
7 have been caused to work improperly. I do not
8 know.
9    Q.    Is it fair to say then that you did
10 not take into account any aspect of the
11 mechanics of how the lid lock would work, how
12 fast it would be spinning, how long it would
13 spin for, how long it would take it to get to
14 full speed, how long it would take it to stop?
15 You didn't take into account any of those
16 factors in terms of forming any of the opinions
17 expressed in Exhibit 4. Is that a fair
18 statement?
19    MS. SARO:  Just note my form
20 objection.
21    A.    Yes.
22    Q.    When you say the cause of death,
23 medicolegal question No. 1, you use the term
24 accidental ligature strangulation. What do you
25 mean by that term?

21

1    A.    Number one, that the cause of death
2 is strangulation; two, ligature in the sense
3 that it's something that encircled the neck;
4 and, three, that it was accidental in its
5 occurrence.
6    Q.    What specifically do you mean
7 accidental in its occurrence? Are you ruling
8 something out?
9    A.    Yes, homicide, suicide and natural
10 death.
11    Q.    How did you rule out homicide and
12 suicide?
13    A.    I ruled out homicide by virtue of
14 the evaluations, studies and investigations
15 conducted by the police department and the
16 medical examiner's office and the deposition of
17 the mother. I also ruled out suicide because
18 of the absence of any such insertions,
19 allegations, beliefs, any history of that kind
20 of mental health illness and in part by what
21 would be an extremely bizarre form of suicide
22 if a 12-year-old boy were to reach the point of
23 deciding to commit suicide. For me as a
24 forensic pathologist dealing with cases in
25 which the manner and mechanism of death have to

6 (Pages 18 to 21)

22

1 be ascertained and upon which opinions have to
2 be expressed as well as cause of death
3 opinions, then I deal with and move to those
4 questions. In my analysis of this case, based
5 upon everything that was done and checked into
6 and so on, that is my opinion, and I don't
7 hesitate to say that the fact that no criminal
8 charges, allegations of homicide have been
9 brought against the mother of this boy and the
10 fact that the medical examiner's office, which
11 is a good office, signed it out as accidental
12 contributed to and in buttress and are
13 completely consistent with the opinions that I
14 have arrived at independently.
15    Q.   Again, you said your opinions rely
16 upon your understanding of the -- or your study
17 of the manner and mechanism of the accident?
18    A.   Well, no. The opinion I expressed
19 contains my thoughts as to the manner and
20 mechanism. The decision or opinion of the
21 manner of death is indeed related to and
22 entwined with the mechanism. So once you
23 determine cause of death and then you evaluate,
24 analyze the mechanism by which the death
25 occurred, you are then led to a determination

23

1 of the manner of death.
2    Q.   What study did you do of the
3 mechanism of death?
4    A.   I reviewed all of those records and
5 materials that have been sent to me, and I have
6 thereby ruled out anything else as not only an
7 alternative, plausible explanation, but not
8 even any other explanation that I can conjure
9 up letting my mind run free.
10    Q.   Without any understanding of how the
11 washer works, how can you say that you have an
12 understanding of the mechanism of the accident?
13       MS. SARO: Again, just note my
14 objection to the form of the question.
15    A.   An analogous situation would be
16 doing an autopsy on someone who has been run
17 over by a car. The mechanism is the impact of
18 the automobile. Once you have ruled out other
19 things directly through police reports or
20 whatever that analogous situation might be,
21 then you are left with that. You can then deal
22 with the manner of death, but the cause of
23 death and the mechanism of death are clear. In
24 this case there is absolutely nothing. I mean,
25 I'm unaware, as I sit here today, of any

24

1 possible thing.
2       For example, what if this were a
3 65-year-old man. This was the father of the
4 woman in the house rather than her son and you
5 did an autopsy and you found some
6 atherosclerosis of the coronary arteries, you
7 have to think, gee, maybe cardiac arrhythmia,
8 lost consciousness or so on. What if he were a
9 diabetic with a history of labile glucose
10 levels and so on, did he have a hypoglycemic
11 episode or so on.
12       You've got a 12-year-old boy and he
13 is found by this machine. He is autopsied.
14 There are markings on the neck. Everything
15 else is ruled out. There are no other injuries
16 that would have been inflicted upon him by
17 somebody else that would have led to his death
18 or produced unconsciousness and which preceded
19 his then being placed in part into the machine.
20 I mean, I don't know what more to say. I don't
21 want to waste your time. If there were
22 anything else, I would tell you. I can't
23 phantom for the life of me what else could be
24 considered here. I don't like to be absolute
25 and dogmatic and I recognize, probably more

25

1 maybe than most of my colleagues, possibilities
2 when there are possibilities. I am not aware
3 of any other possibility in this case.
4    Q.   Your analogous of the car accident,
5 with all due respect, nobody is disputing that
6 he died by a strangulation as a result of
7 getting his sweater caught in the spindle. I'm
8 focused on your conclusion that it was
9 accidental, ruling out suicide or other means.
10 And going back to that, how can you say
11 accidental if you don't have even a rudimentary
12 understanding of how the washer worked and how
13 you could possibly get into that position
14 accidently?
15       MS. SARO: Just not my
16 objection to the form. Go ahead, Doctor.
17    A.   I have a rudimentary understanding
18 by virtue of my having read the report of the
19 person who studied the machine, also by having
20 read about the machine from the company itself
21 with the instructions how fast it works, how
22 long it takes to become operational, whether
23 the lid lock worked and so on. They don't
24 change for me anything at all. These are
25 things of a mechanical nature about which I

7 (Pages 22 to 25)

26

1 express no opinions. It makes no difference to
2 me for purposes of the opinions that I
3 expressed what the answers to those questions
4 are. What ultimately may be determined about
5 the functional correctness of this piece of
6 equipment that is not for me to speculate upon.
7    Q.   How long were Deshaw's arms? What
8 was his reach?
9    A.   I don't know of course in my own
10 personal knowledge. As I recall, that
11 measurement was not made in the autopsy report.
12 I don't recall seeing that measurement.
13    Q.   If you don't know his specific arm
14 length, do you have from your experience any
15 assumption or any basis upon which to
16 approximate the arm length of a 12 year old
17 five foot five inch tall average child?
18    A.   A five foot five and a half inch
19 person would have arm lengths that would
20 generally fall within a range of an inch or
21 two, and such measurements are readily
22 available I'm sure in different kinds of
23 anthropological tables. I have not checked
24 those. That can be done. I'm not aware from
25 the description of this youngster by the

28

1 the average height of American housewives who
2 do 95 percent probably of these kinds of chores
3 in our male chauvinistic society are not as
4 tall as five foot five and a half inches. I
5 just believe, I could be wrong, that the
6 machines are not made so as to require a stool
7 upon which these women must stand in order to
8 reach the back mechanism. So I think that
9 whatever the distance is and whatever the
10 length of his arm might be and whether he did
11 this or not, I don't know, but that if he
12 wanted to or that it is alleged or believed
13 that he did do it, that he would have been able
14 to reach it without standing on anything.
15    Q.   Did you see in the police report
16 indication that the clothes in the washing
17 machine were dry when the police observed them?
18    A.   Yes. In fact, I think I even make
19 reference to that in my report, as I recall. I
20 know that I have seen that and agree with that.
21 The answer is, yes, I'm aware of that. I was
22 just looking to see whether I actually even set
23 that forth in my own report.
24    Q.   Does that have any significance to
25 you in terms of your understanding of the

27

1 medical examiner that there was anything
2 anatomically abnormal. So, therefore, whatever
3 that range is, and it can be readily
4 ascertained either by going to the literature
5 or by getting four or five people who are about
6 5'5", 5'6" in height and making the
7 measurement.
8    Q.   And I take it from your answer then,
9 A, you don't know, as you sit here today, what
10 that number would be, and implied in that is
11 that you've not undertaken as part of forming
12 your opinions in this case any anthropological
13 study of that question?
14    A.   That is correct.
15    Q.   Do you know and did you consider as
16 part of forming your opinion in this case
17 whether he could reach the control knob on the
18 back panel of the washing machine without
19 having to step on something or without having
20 to raise himself up in some manner?
21    A.   The answer is no, qualified by the
22 belief that these machines have to be made in
23 such a way that a five foot five and a half
24 inch person would be able to reach that
25 mechanism. That is based upon my belief that

29

1 manner and mechanism of the accident?
2    A.   No.
3    Q.   Do you dispute the fact that that
4 would mean that whoever turned the machine on
5 would have to have set it to the spin cycle
6 intentionally and then turned the machine on?
7        MS. SARO:   Just note my
8 objection to the form.
9    Q.   Do you dispute that?
10    A.   I neither dispute nor acquiesce. I
11 have no opinion.
12    Q.   And I take it that you have no
13 opinion one way or the other as to the
14 proposition that he would have to have also
15 been pressing down somehow the lid lock
16 mechanism simultaneously to starting the
17 machine?
18        MS. SARO:   Again, form
19 objection. Go ahead, Doctor.
20    A.   I have no opinion.
21    Q.   Do you have any opinion as to the
22 position he was in when his sweater sleeve was
23 first caught by the spindle?
24    A.   Yes. Here by inference in reading
25 about his mother finding him, the position of

8 (Pages 26 to 29)

VERITEXT/NEW JERSEY REPORTING   (973) 410-4040

**30**

1 the sweater and so on, I do believe that he
2 would have been facing the machine pretty much
3 straight on, and I do believe that the right
4 arm had been inside the machine far enough and
5 down enough for some part of the right sleeve
6 of the sweater to have been caught by the
7 turning mechanism. So that's all I can say. I
8 don't know. In other words, I have no reason
9 to believe he was sitting or standing or with
10 his back to the machine. I think in order for
11 things to have happened the way they have been
12 described, he would have had to have been
13 facing the machine more or less, and the right
14 arm had to have been inside the cavernous
15 component, the total space of the machine. It
16 wasn't sucked in by -- I'm not aware of any
17 suction, and I think the spindle part I know it
18 doesn't shoot up or protrude or project upward.
19 So, therefore, the arm had to have been down
20 and inside to some extent.
21    Q.    You say the arm. Do you mean his
22 arm, or do you mean his sleeve?
23    A.    The right arm. Well, the arm was in
24 the sleeve. I do believe that the arm was in
25 the sleeve.

**31**

1    Q.    That is your understanding of how
2 the accident happened?
3    A.    Yes, and that the sleeve then got
4 caught.
5    Q.    Did you see any indication anywhere
6 in your review of the file that his right arm
7 was out of the sleeve at the time that he was
8 found?
9    A.    Yes. I think I do recall that that
10 sleeve was wrapped up around -- yes, that his
11 right arm was not in the sleeve when he was
12 found. That is my understanding.
13    Q.    Is it your opinion, though, that his
14 arm was in the sleeve at the moment the sleeve
15 got first caught in the spindle and that he
16 must have, therefore, pulled his arm out during
17 the happening of the accident?
18         MS. SARO: Just note my
19 objection to the form. You may answer.
20    A.    That is indeed one possibility. I
21 think it's not impossible or let me express it
22 positively. I think it would be possible for
23 the right arm not to have been in the sleeve,
24 the right sleeve of the sweater, for the sleeve
25 to have hung down and to have become entwined

**32**

1 by the turning spindle. I think that that
2 could have happened too. I do not know. I
3 think that's possible.
4    Q.    I just want to make sure I
5 understand your last answer. So you're saying
6 it's possible that his right arm may have been
7 in the sleeve, but it's also possible that it
8 may have been out of the sleeve at the moment
9 the sleeve was first caught in the spindle?
10    A.    Yes. I can close my eyes and see we
11 have got a sleeve hanging down for whatever
12 reason and in whatever fashion. The washing
13 machine would not differentiate between the
14 sleeve hanging down without an arm in it from a
15 sleeve hanging down encircling the arm in the
16 usual form of a tire.
17    Q.    Again, I just want to be clear. I'm
18 just looking for a yes or no answer. Are you
19 saying that both are possible, both of those
20 situations are possible, or are you saying only
21 one was possible in this instance?
22    A.    No. I think either is possible, and
23 I do not express an opinion at this time. It's
24 possible that if I -- I mean, if there were
25 more tests done, and I had those, I just want

**33**

1 to say that for the record, I might arrive at
2 some opinion. Right now based on what I know,
3 I think they are two possibilities. I cannot
4 and do not express an opinion as to which of
5 the two.
6    Q.    If it were not physically possible
7 for his arm to have been in the sleeve at the
8 moment the sleeve was caught in the spindle
9 because of the mechanics of how the washer
10 worked, would that impact your opinion at all
11 with respect to whether you were able to offer
12 an opinion that the manner and method of the
13 death was accidental as opposed to suicide or
14 homicide?
15         MS. SARO: Just note my
16 objection to the form. Go ahead.
17    A.    No. The scenario that you have
18 outlined would not impact upon the
19 determinations as to the mechanism and manner
20 of death and obviously not on the cause of
21 death.
22         (Wecht Exhibit No. 6 was
23 marked for identification.)
24    Q.    I'm showing you Exhibit 6. Have you
25 seen at least a black and white copy of that

9 (Pages 30 to 33)

34

1 picture before?
2   A.   Yes.  It sure does look familiar, as
3 I recall.
4    Q.   And you recognize and acknowledge
5 that to be a photograph of the washing machine
6 in question with the lid up?
7    A.   Yes.
8    Q.   And do you understand that the black
9 rectangular opening on the lower right-hand
10 corner of the photograph that I'm pointing to,
11 that's the opening for the lid lock mechanism?
12 Do you understand that?
13       MS. SARO:  Just note my
14 objection to the form, but you can answer.
15   A.   I hadn't thought about it.  I accept
16 that.  I mean, it seems to be a slot and it
17 would be subjacent to this device that one sees
18 on the now elevated lid.  That would seem to
19 coincide.  So, yes, I believe that.
20       (Wecht Exhibit No. 7 was
21 marked for identification.)
22    Q.   I'm going to show you another
23 photograph.  Photograph 7 is another
24 photograph.  This one shows the control panel
25 to the washing machine with the lid down.  Have

35

1 you seen that before, and do you acknowledge
2 that that is what it is?
3    A.   Yes.  That's what it appears to be.
4    Q.   Do you agree that when the lid is
5 up, it blocks the control knob?
6    A.   Well, it blocks it visually.  I
7 can't determine whether it blocks it in terms
8 of somebody reaching around.  I cannot tell and
9 I do not know.  I'm not saying that it does or
10 doesn't.  I'm just pointing out that when the
11 lid is up, I don't know if there is any space
12 between what would be the top of the lid and
13 the back panel, but certainly I agree visually
14 you cannot see it.
15    Q.   In forming your opinions, did you
16 understand that since the clothes were dry,
17 that Deshaw Young must have, if it was, in
18 fact, an accidental death, Deshaw Young must
19 have been the one who turned the machine on?
20       MS. SARO:  Just note my
21 objection to the form.
22    A.   I have no opinion in response to
23 that possible scenario.
24    Q.   Let me back up.  Is it your opinion
25 that Deshaw Young turned the machine on

36

1 himself?
2    A.   I have no opinion about that.
3    Q.   Would it have any impact in terms of
4 your opinion that the manner and mechanism of
5 death was accidental if you knew that in order
6 to start the machine in the spin cycle, you
7 would have to -- let me back up.
8       Would it make any difference to your
9 opinion regarding the manner and mechanism of
10 death characterized by you as accidental to
11 know that in order to start the machine with
12 the lid up, one would have to simultaneously
13 depress the lever and pull the control knob
14 which is located behind the raised lid in
15 Photo 6?  Would that have any bearing on your
16 opinion?
17    A.   No.
18       MS. SARO:  Just form
19 objection.  You may answer.
20    Q.   And I take it you did not take that
21 into account in forming your opinion in this
22 case.  Is that a fair statement?
23    A.   That's correct.  I did not take into
24 account any of the possible ways in which this
25 machine could have been moving with the lid up.

37

1 I am well aware, obviously, that this gets to
2 the heart of the issues in this case, but I
3 would not address these, and I want to say too
4 I'm trying not to be evasive.  Sort of in my
5 own case as coroner I would get the homicide
6 detectives and mechanical or electrical
7 engineers from Pitt or Carnegie Mellon.  I just
8 want to let you know I would not make those
9 determinations myself.  I would want to know
10 their opinions.  I'm not saying I would be
11 disdainful.  I would solicit those thoughts and
12 opinions, but I myself would not arrive at
13 them, because I know nothing about mechanics.
14    Q.   Do you have any knowledge or
15 understanding as to how far into the tub the
16 sleeve would have to be in order for it to
17 catch on the spinning spindle?
18    A.   No, other than obviously some
19 portion, presumably the distal portion, but
20 maybe even not necessarily that, but more
21 likely far enough down to reach the turning
22 cycle.  Again, that would be a measurement that
23 others would make.  I do not know other than
24 that sleeve either drooping down.  Especially
25 if it's not encircling an arm, it's not going

10 (Pages 34 to 37)

38

1 to be folded in some widget fashion.
2 Therefore, it has to be kind of hanging down,
3 but, in any event, no, I do not know. That
4 would be a measurement from the opening down to
5 the superior most portion of the spindle, and I
6 guess that can be and probably has been
7 measured.
8    Q.   Was there any evidence of injury to
9 his right hand or arm noted in autopsy or
10 observed by you in your review of the file or
11 photographs?
12    A.   No. As I recall, no injuries were
13 noted on the hands or fingers.
14    Q.   How much pressure needs to be
15 applied to the jugular vein in order to stop
16 blood flow?
17    A.   Pressure, depending upon the degree
18 of subcutaneous fat, I don't recall offhand
19 exactly what has been measured in terms of
20 pounds of force, but not a great deal in a
21 slender person of 110. The jugular veins are
22 just beneath the skin several pounds. I could
23 check that easily enough but not a tremendous
24 amount of force. I forget. It's around
25 something like 11, 12 pounds of force. I would

39

1 have to check.
2    Q.   But as you sit here today, you would
3 expect that number to be in the range of 10,
4 11, 12 pounds, something in that realm of
5 thinking?
6    A.   I think something like that, yes.
7          MS. SARO: On a 110 pound boy?
8          THE WITNESS: Yes. It would
9 vary, yes.
10    Q.   And the same question with respect
11 to the carotid artery. Would it be more?
12 Would it be less?
13    A.   It would be more, because the
14 carotid arteries are deeper, and in order to
15 compress them, more pressure would have to be
16 applied. Again, I checked that number out, but
17 more and significantly more, not just another
18 pound or two more but several pounds more.
19    Q.   And something on the order of 20 to
20 30 pounds would that be an approximation?
21    A.   That's possible in that range.
22 Again, I could check that out. It would vary,
23 as I say, from one person to another, but
24 something on that order, not just a little bit
25 more than what is required to compress the

40

1 jugulars.
2    Q.   Recognizing that you have not
3 undertaken any study of the specific mechanics
4 of this washing machine, would it be your
5 expectation -- an opinion, rather, that a
6 sweater caught by the sleeve in the full spin
7 cycle could tighten around the wearer's neck
8 and create enough force to compress the jugular
9 vein to the point that blood flow stopped?
10    A.   Yes.
11    Q.   And the same question with respect
12 to the carotid artery. In general, would you
13 think that the amount of pressure generated
14 from a sweater caught in a full spin cycle
15 could generate enough pressure to compress the
16 carotid arteries and stop blood flow?
17    A.   I think it would be difficult for
18 enough force to be generated and imparted to
19 the neck to produce compression of the carotid
20 arteries. However, I am not prepared and do
21 not say that it would be impossible. I think
22 depending upon how much encirclement there
23 would be, and then what would be the
24 juxtaposition of the neck of the victim to the
25 spinning equipment, that would then determine

41

1 whether that degree of force is sufficient to
2 compress the carotid arteries could be
3 produced.
4          I think physics would be such that
5 the longer the sleeves the greater the distance
6 the lesser the amount of force as if one were
7 pulled in closer and closer. Then you could
8 have more force applied. So that is the only
9 thing I can say. Then trying to picture where
10 the boy exactly was, my understanding is his
11 mother found him kind of leaning over and she
12 just pulled him out and sat him on the floor.
13 So I don't know exactly whether there was one
14 loop of the sweater or two loops or so on.
15          So getting back to your question, I
16 think the answer is unequivocally and
17 unhesitantly yes for compression of the
18 jugulars, much less likely for compression of
19 the carotids for reasons that I have expressed.
20          MR. OSTERMAN: Will you read
21 his answer back.
22          (Last answer read back.)
23    Q.   Sir, in your answer that we just had
24 read back you said that it's possible but in
25 your opinion not likely that a sweater sleeve

11 (Pages 38 to 41)

42

1 caught in the full spin cycle of the washer
2 could generate enough force to be imparted to
3 the neck to compress the carotid artery, and
4 you said it would determine only, and one of
5 the things you listed was how much it encircled
6 the neck. I just want to focus on that one
7 factor, and you listed other factors.
8    A.   How much it encircled the spinning,
9 the spindle.
10    Q.   So that part of your answer that's
11 what you meant, in other words, how far around
12 it was wrapped around the spindle?
13    A.   Well, yes, because then that would
14 tell you how close the boy's neck would have
15 been to the turning mechanism.
16    Q.   And the closer his neck was pulled
17 to the mechanism the more force that would be
18 imparted to the neck and specifically the
19 carotid arteries?
20    A.   Yes, I believe so.
21    Q.   And you then later said you don't
22 know whether the sweater was one loop or two
23 loops or more than that wrapped around the
24 spindle. Is that a fair statement?
25    A.   That's correct.

43

1    Q.   And then you also referenced the
2 juxtaposition of the neck to the equipment.
3 What did you mean by that?
4    A.   That's just another way of putting
5 it.
6    Q.   Same thing?
7    A.   Exactly the same thing.
8    Q.   Did you see any evidence that he was
9 pulled forcefully into and his face contacted
10 the washing machine within the course of the
11 accident?
12        MS. SARO: Just note my
13 objection to the form.
14    A.   I'm not aware of that the mother
15 ever indicated that, and of course nobody else
16 saw the boy when he was found at the machine.
17    Q.   Did you see any evidence in the
18 police reports of blood being found on the lid?
19    A.   Well, he had some abrasions.
20    Q.   I'm specifically referring to blood
21 on the lid?
22    A.   No. I'm saying blood comes from the
23 body, and I know you asked me about on the lid.
24 I'm saying if he had some abrasions, so that
25 can account for some blood, but you are asking

44

1 about on the lid. I don't recall. If you have
2 it there, please point it out. I'm looking
3 quickly through the attachments to the medical
4 examiner's report, and I don't see it.
5    Q.   The abrasions that you observed --
6 I'm sorry -- the abrasions that you referenced
7 where were the abrasions on his body?
8    A.   The abrasions were -- I'm reading
9 now from page 3 of the autopsy report. There
10 were superficial abrasions on the anterior
11 aspect of the neck toward the left and there
12 was described a horizontal contused abrasion,
13 measuring three and a half inches in length on
14 the left side of the neck. Then on the right
15 side of the neck seven inches below the top of
16 the head there were two separate abrasions,
17 measuring about a half an inch in greatest
18 dimension. Then back to the left side of the
19 neck he describes another superficial abrasion
20 extending around toward the back, measuring two
21 and a quarter inches in length, and then on the
22 right side of the neck he describes an
23 indistinct abrasion, measuring three quarters
24 of an inch, and there was a red colored
25 contusion medial and below the left nipple, one

45

1 half by one quarter of an inch. So those were
2 the abrasions that were described by the
3 pathologist.
4    Q.   The abrasions of the neck, one of
5 them you mentioned was a horizontal contusion
6 or a contused abrasion, I think you said?
7    A.   He described it as a contused
8 abrasion that was on the left side, left
9 lateral aspect.
10    Q.   Point to that on you.
11    A.   The sternocleidomastoid muscle which
12 he references is the muscle that goes up from
13 the sternum onto the clavicle onto the mastoid.
14 So it goes up in kind of a diagonal fashion.
15 So if you turn your neck, you can feel that
16 muscle there (indicating), and he's telling us
17 that on the left side of the neck overlying
18 that muscle there was this horizontally
19 oriented abrasion which had a contused
20 appearance, and it measured three and a half
21 inches in length. So it's on the left side of
22 the neck.
23    Q.   Were all of the abrasions and
24 contusions noted there on the neck area in your
25 opinion caused by the ligature of the sweater

12 (Pages 42 to 45)

46

1 around the neck?
2    A.   Yes.
3    Q.   What about the contusion on the
4 chest below the left nipple?
5    A.   I think that small area of contusion
6 was not caused by the sweater, and it probably
7 was caused then it was pulled down and that
8 part of the chest would just impact against the
9 top of the machine and produce a small bruise.
10    Q.   Do you have any opinion as to
11 whether he was literally pulled in to the
12 machine by the spinning of the spindle?
13    A.   I think to some extent he would have
14 been pulled in.  I have no opinion with regard
15 to a specific measurement.  My answer is
16 intended to say that I do not envision him
17 remaining in an upright standing position once
18 the sweater sleeve becomes caught and the
19 spindle is moving.  There, I think, has to be
20 some pulling of him downward by virtue of the
21 sleeve moving around and the sweater still on
22 his body.
23    Q.   For the sweater to have tightened
24 tight enough to ultimately kill him around his
25 neck, would it in your opinion have had to have

47

1 lifted him up at least off his toes in front of
2 the machine?  In other words, was his full
3 weight being held up by the sweater?
4    A.   No.  I do not believe that it would
5 have been necessary for his body to have been
6 lifted either off the ground or even onto his
7 tippy toes.  That kind of gets back to a
8 question you asked me some time ago about the
9 height of the machine.  We have this five foot
10 five and a half inch boy, and depending upon
11 what the distance is between his neck and the
12 top of the machine, would determine in great
13 measure how much of a forward downward movement
14 would have occurred from the head, face and
15 upper torso.  I don't think he would have had
16 to have been lifted from the ground
17 necessarily.
18    Q.   Well, whether he had to be
19 necessarily, do you have an opinion one way or
20 the other as to whether he was?
21    A.   The answer is, no, I do not have an
22 opinion.
23    Q.   Wouldn't that impact the likelihood
24 of the carotid artery being compressed?  In
25 other words, if it pulled him up to the point

48

1 that it was lifting him up either on his tippy
2 toes or completely off his feet, wouldn't that
3 increase the likelihood of compression of the
4 carotid artery to the point of blocking blood
5 flow.
6    A.   Well, actually, I think the
7 opposite.  If he were lifted up and pulled
8 down, at least initially maybe, he might be
9 just fortuitously bending with the flow, so to
10 speak, going in with the movement and so on.
11 However, consistent with the answer I gave
12 before, if the encirclement continued and he
13 were pulled up, it's not that his being pulled
14 up, per se, could lead to greater pressure on
15 the carotids, but the fact that he has been
16 pulled up would indicate that the sweater is
17 becoming more encircled and greater force is
18 being imparted, as I indicated before.  But
19 right from the beginning if somebody is being
20 pulled up or into something, and if you can
21 kind of go with it, you would at least
22 initially decrease the pressure, whereas if you
23 just continue to stand and somebody is pulling
24 you or something is pulling you and just stand
25 there for whatever reason, then there would be

49

1 greater force if you say, hey, okay, stop
2 machine or stop person and so on, you could
3 diminish it, but if you continue -- if what it
4 is that is pulling you down continues to get
5 stronger and stronger and pulls you more and
6 more, then I think you have a greater force
7 being imparted.  Also, then by definition or
8 inherent in such a hypothetical scenario you
9 have a temporal component, that if there is
10 more encirclement and more pulling in, then you
11 are adding some seconds.  I don't mean a long
12 period of time.  I have no way of measuring
13 that, but that becomes another element too in
14 the formula.
15    Q.   You've listed a number of variables,
16 and I had asked you on just about every single
17 one of them whether you had any knowledge or
18 understanding or opinion as to things like the
19 speed at which it's spinning, the length of his
20 sleeve, his position relative to the spindle
21 and whether it's lifted him up and off the
22 floor and so forth, and on each and every one
23 you told me you didn't have an opinion.  Given
24 all of the unknown variabilities, how are you
25 able to offer an opinion to a reasonable degree

13 (Pages 46 to 49)

50

1 of medical certainty that in this case the
2 tightening of the sweater around his neck did
3 not compress the carotid arteries sufficient to
4 block blood flow?
5         MS. SARO:  Just note my
6 objection to the form.  You may answer.
7    A.    Well, for one thing, as I expressed
8 in my report, as the right sleeve becomes
9 encircled and pulls, it's the left side of the
10 neck which is being compressed by the sweater.
11 The right side is being pulled away from the
12 neck.  You can't have both sides being
13 compressed simultaneously.  So you have that
14 unevenness to begin with by virtue of how this
15 would have evolved no matter how it got
16 started.
17        The second thing is, you've got a
18 tremendous amount of petechial hemorrhages
19 florid, to use the word of prosector, and it's
20 a perfectly applicable, adjectival description
21 because they are florid and you see them in the
22 subscapular area too in the photo.  These are
23 all manifestations of venous congestion.  These
24 fit in with the engorgement produced by the
25 compression on the jugular veins and you would

51

1 not get, in my opinion, this amount and the
2 profuse distribution of these petechial
3 hemorrhages if you did not have this continuing
4 jugular compression.  So I think, and as I have
5 said, the amount of force that would be
6 required to produce bilateral carotid artery
7 compression would be substantial and would then
8 be required bilaterally.  So I do not believe
9 that the death was that quick and the
10 pathophysiological process is that rapid that
11 he would have been able to develop this profuse
12 distribution of florid petechia.
13    Q.    When you refer to the tremendous
14 amount of florid petechia, is that your
15 characterization based on your review of the
16 black and white copies of the photos, or are
17 you relying on the description provided in the
18 autopsy report?
19    A.    Both.
20    Q.    Show me the photos you are relying
21 on.
22    A.    These collectively and individually
23 depict petechia, this group that I've just
24 handed you, and this second group depicts
25 severe congestion in neck structures, different

52

1 from petechia but very severe congestion.
2    Q.    The first batch of photographs I'll
3 just identify by the Bates number that was
4 provided.  All of them have the prefix DEF and
5 then Nos. 223 through 230, inclusive 234, and
6 235 and 249.  And these show petechial
7 hemorrhaging?
8    A.    Yes.
9    Q.    You would acknowledge these are not
10 great quality autopsy photographs?
11    A.    Well, the version that I have.  I'm
12 not criticizing the photos but the black and
13 white faxes.  Of course, I would obviously
14 prefer to see the originals, but you ask me on
15 what I relied.  So I seen those and then I
16 correlate with the autopsy report.  They would
17 be showing much more clarity and dramatically
18 in the color photos.
19    Q.    But you have not seen those.
20    A.    No.
21    Q.    The photos showing the congestion
22 are marked Bates No. DEF247, 248, 250, 251, 236
23 through 243 inclusive.  Where are the
24 references that you are relying in the autopsy
25 report with respect to the extent of the

53

1 petechia hemorrhaging?
2    A.    Well, beginning on the first page of
3 the report, not counting what I'll call the
4 cover sheet, the part that begins with the word
5 up on top certification and then just below
6 external examination.  So you see there in the
7 third paragraph, the second sentence, the face
8 showed evidence of suffusion and extensive
9 petechial hemorrhages extending from the
10 forehead, eyelids, face and upper neck region.
11    Q.    Which paragraph?
12    A.    Under external examination I was
13 reading the third paragraph.  Now, then the
14 fourth paragraph, the next one, the third
15 sentence reads the conjunctiva both the
16 palpebral and the bulbar showed florid
17 petechial hemorrhages and confluent petechial
18 hemorrhage on the medial aspect of the bulbar
19 conjunctiva bilaterally.
20    Q.    What does that mean, that sentence?
21    A.    The covering of the eyes called the
22 conjunctiva, and the part under the eyelids is
23 the palpebral, and the part over the eyeball is
24 the bulbar.  So he's describing these on both
25 the palpebral when you lift up the eyelid and

14 (Pages 50 to 53)

**54**

1 peel it back, and you'll see in one of those
2 pictures that they are peeling it back with a
3 stick or something. It's like the
4 ophthalmologist does some times, if you've ever
5 been there, and he really wants to get a good
6 look at your eye and then over the eye itself.
7     Then going to the next page I don't
8 see any reference there, and going to the third
9 page it says evidence of injury in caps. In
10 the first sentence, "As mentioned there was
11 florid petechial hemorrhages involving the face
12 and upper neck region. These started above the
13 interrupted ligature mark around the neck.
14 This extended from the left towards the right
15 side."
16     Continuing down the last three, four
17 sentences, the last three sentences, I think,
18 under evidence of injury reads, "However, there
19 was marked suffusion of the base of the tongue
20 and congestion and enlargement at the lingual
21 tonsils. The retropharyngeal region also was
22 congestion (sic). The tracheo-larynx showed
23 congestion and focal petechia."
24     Then going to the next page 4, the
25 very top, "Head (Central Nervous System)."

**55**

1 Second sentence, "There is marked petechial
2 hemorrhages of the galeal tissue, especially
3 involving the left temporalis muscle region."
4     Q.   What does that mean?
5     A.   Galeal is underneath the scalp. We
6 call that subscapular or subgaleal. It's a
7 tight membrane, and so he's describing all of
8 these hemorrhages, and he says especially in
9 the left area just in from the ear would be the
10 left temporal region in from and a little bit
11 above and behind and below is the temporal
12 area.
13     Q.   So that would be under the skin?
14     A.   Underneath the scalp, yes. That is
15 right. The scalp has been reflected, and he's
16 now telling you what it looks like there.
17     Now, going down to that page
18 respiratory system, the second sentence, "The
19 pleural surfaces were smooth glistening and
20 mild focal petechia were noted."
21     And then on the top of page 5 under
22 Alimentary Tract the third sentence in that
23 paragraph, "The base of the tongue showed
24 marked congestion as mentioned."
25     Q.   What causes congestion?

**56**

1     A.   Pardon me?
2     Q.   What causes congestion?
3     A.   A backup, an engorgement of blood.
4 Congestion means blood inside blood vessels,
5 hemorrhage is blood outside blood vessels. So
6 congestion in a case like this would be due to
7 the fact that the blood is not being
8 circulated. It's not getting back to the
9 heart. It is backing up, and when it backs up,
10 it gives you congestion.
11     Q.   Were you done?
12     A.   Yes. I think that I have -- well,
13 here going down under evidence of injury then
14 on that page there is one more. The last
15 paragraph before internal examination.
16     Q.   Which page?
17     A.   He calls it page 3. You have a big
18 paragraph called evidence of injury. The last
19 short paragraph -- the second paragraph which
20 is short reads in the third sentence, "Focal
21 petechial hemorrhages that were superficial
22 were noted in the left pectoral region above
23 the left nipple."
24     Q.   Can petechial hemorrhage occur in a
25 situation involving the compression of both the

**57**

1 carotid and jugular?
2     A.   Yes.
3     Q.   In your opinion if there were
4 compression on both the carotid and jugular,
5 would the petechial hemorrhaging look different
6 than if only the jugular was compressed?
7     A.   Yes, because I think if the carotid
8 arteries were compressed, then you would not be
9 getting blood going up through the arterial
10 system, and, hence, the degree and extent of
11 the congestion which is what produces the
12 petechial hemorrhages would not have occurred.
13 In other words, for this profusion of petechial
14 hemorrhages such as we see here to occur you
15 have got to have substantial congestion caused
16 by a backing up of blood in compressed jugular
17 veins. The blood coming down from the head and
18 face eventually into the jugular veins can't
19 make its way down, and so you get all of these
20 petechial hemorrhages. If you had blood not
21 going up because carotid arteries were
22 compressed, then you wouldn't have that much
23 blood being backed up. So I think what we are
24 seeing is a manifestation of more backing up in
25 which the blood has been able to get on up into

58

1 the head through the arterial system but cannot
2 then make its way back down through the venous
3 system into the superior vena cava and the
4 heart.
5    Q.   If you have compression of only the
6 carotid artery and not compression of both
7 jugulars, could you still see petechial
8 hemorrhaging?
9    A.   I don't think that you could have
10 that in terms of a strangulation.  There would
11 be no way that I could think of in which you
12 could have force imparted into the neck to
13 produce compression of the carotids without
14 compressing the overlying more externally
15 located jugulars.  You couldn't do that.
16    Q.   If you had compression of only one
17 of the carotid arteries, how long would it take
18 before loss of consciousness, assuming a
19 blockage of the jugulars?
20    A.   I think it would take about a minute
21 or so, because the other carotid would suffice.
22 Some people have total blockage of the carotid
23 artery due to atherosclerosis or other reasons.
24 So as long as you have one carotid, you might
25 eventually wind up with some brain damage from

59

1 one part of the brain not getting its full
2 supply, but in terms of consciousness, I think
3 you would still have about a minute because of
4 the other carotid artery supplying arterial
5 oxygenated blood to the brain.
6    Q.   In your opinion in this case would
7 the loss of consciousness to the decedent have
8 progressed gradually, or would it have just
9 been -- in other words, would he have been
10 fully conscious until that moment?
11    A.   No.  It doesn't work that way.
12 Unless you get your head smashed in or your
13 heart blown out with a shotgun blast, you don't
14 have unconsciousness occurring in a literal
15 split second.  Unconsciousness is an
16 ingravescent course.  Full consciousness to
17 some beginning loss of consciousness leading
18 into less and less consciousness and then
19 unconsciousness, semicoma, coma, stupor and
20 death.  So the answer is, no, it does not
21 happen in a split second.  You have
22 consciousness and that begins to leave you and
23 then you move into a state of unconsciousness,
24 and even unconsciousness has its own levels
25 too, pretty much like anesthesia, Grades I, II,

60

1 III and IV.
2    Q.   In this case you've opined that it
3 would have taken approximately one minute for
4 him to lose consciousness; is that correct?
5    A.   Yes.  I think that after about a
6 minute or so, I think he would have been
7 unconscious.
8    Q.   At what point would he have begun to
9 lose consciousness, in your opinion?
10    A.   I think probably after about in this
11 kind of situation in about 15 seconds I think
12 he's going to begin to have a decreased level
13 of full consciousness, just roughly, and then
14 probably over about 45, 50 seconds he's going
15 to decrease slowly, and then move into
16 unconsciousness after about a minute, roughly.
17    Q.   Was there any evidence that he
18 struggled against the ligature as it tightened
19 around his neck and you saw from the autopsy?
20    A.   I find no evidence one way or the
21 other.  I mean, there is nothing I can point to
22 to indicate that he did and nothing that I find
23 that would preclude that from having occurred.
24 This was a smooth surfaced piece of equipment
25 externally.  The sweater itself is not jagged.

61

1 It's soft fabric.  So there is no evidence one
2 way or the other.
3    Q.   In autopsies such as this have you
4 ever looked for evidence such as scratch marks
5 on the neck or bruises on the fingertips
6 suggesting that the victim tried to pull back
7 against the ligature?
8    A.   Some times you can find that.  In
9 homicidal strangulations where someone is
10 conscious to begin with and aware of what is
11 happening we'll some times see such fingernail
12 marks where the victim is struggling against
13 the assailant.
14    Q.   I think I have asked you this.  I'm
15 not sure.  So I'll ask it one more time.  I
16 take it you have no opinion as to how long the
17 machine would have been spinning after it
18 initially caught his sweater sleeve; is that
19 true?
20    A.   That's correct.
21    Q.   Do you have an opinion as to whether
22 he was conscious or unconscious when it stopped
23 spinning?
24    A.   No; I have no opinion.
25    Q.   Going back to your opinion regarding

16 (Pages 58 to 61)

**62**

1 the petechial, the significance of the
2 petechial hemorrhaging observed in this case, I
3 think I asked you and you told me that
4 petechial hemorrhaging could occur in the case
5 of simultaneous compression of the carotid
6 artery and jugular veins?
7   A.   Yes.  Some petechial hemorrhage
8 could occur.
9   Q.   But you said there would be a
10 difference in the extent of the petechial
11 hemorrhage?
12   A.   I believe so.  In the florid, it's
13 as good a word, I can't think of -- I'm tired
14 of using the same word, but the florid nature,
15 the intensity and the wide pattern of
16 distribution in my opinion are viewed strongly
17 for venous congestion, because that is what is
18 believed to be the principal, if indeed not the
19 sole cause of petechial hemorrhages in cases of
20 asphyxiation.
21   Q.   Can you point to any scientific
22 literature which you are aware that says that
23 you would not get florid petechial hemorrhages
24 in a case involving compression of both carotid
25 arteries?

**63**

1       MS. SARO:  Just note my
2 objection to the form.  You can answer.
3   A.   I have no specific reference.  You
4 can check different textbooks on forensic
5 pathology.  They would be the best books for
6 such discussions and see if you find a
7 discussion that is based upon or which relates
8 to circumstances at least somewhat similar to
9 those encountered in this case.  Insofar as
10 what books are concerned, I can't give you
11 specific books, but I believe that forensic
12 pathology textbooks would be the best source.
13 I don't know that other books of medical
14 specialty would address these things.
15   Q.   And again, same question with
16 respect to the extent of the petechial
17 hemorrhaging as a basis upon which to opine
18 that the carotid arteries were not involved?
19   A.   My answer would be the same.  You're
20 asking me where you might read about this kind
21 of scenario and learn about jugular vein
22 compression, carotid artery compression and so
23 on.  I would refer to forensic pathology
24 textbooks.
25   Q.   But I'm asking specifically do you

**64**

1 have a specific reference that you would cite
2 in support of your proposition?
3   A.   No.  I'm speaking as a forensic
4 pathologist who has been doing this work for 45
5 years in forensic pathology, and those are my
6 opinions.
7   Q.   Are those opinions based on any
8 specific testing that was done in relation to
9 this case?
10   A.   No.  I'm not aware of any testing
11 that was done in this case.  Oh, if you're
12 asking did I do any, no, no testing I can do
13 that I'm aware of.
14   Q.   Describe the extent of petechial
15 hemorrhaging that you would expect to see in a
16 situation in which both the carotid and
17 jugulars are involved?
18   A.   That would vary greatly, but I would
19 expect to see some petechial hemorrhages in
20 different places, certainly on the conjunctiva
21 and maybe elsewhere on the face and so on but
22 just not to the degree and extent and not with
23 the size and intensity.  So, in other words, it
24 would be more a matter of the intensity of the
25 visual demonstrable nature of them rather than

**65**

1 anatomic distribution.  The anatomic
2 distribution would be essentially the same or
3 potentially the same.  Head, face, neck,
4 subscapular areas and so on, that is not going
5 to vary.
6   Q.   You are relying for your opinion
7 regarding the extent of it in this case is
8 based on your review of the black and white
9 xerox copies and then whatever was described by
10 the doctor who performed the autopsy?
11   A.   Well, that is correct.  If the
12 colored photos prove to depict a different
13 picture, I will readily correct and, if
14 necessary, revise.  I'm quite comfortable in
15 conjecturing that the colored photographs will
16 in a much more dramatic and clear fashion
17 demonstrate what was present and correlate with
18 what was described.
19   Q.   Is it your usual practice to rely on
20 black and white xerox copies of photos, or is
21 it your usual practice to obtain the actual
22 colored photos?
23   A.   I would prefer the colored photos.
24   Q.   Can you recall any instance in which
25 you testified based on a review of black and

17 (Pages 62 to 65)

66

1 white xerox copies?
2   A.   Oh, I'm sure that has happened.  I
3 can't tell you a specific case, but there have
4 been cases where I did not get colored photos
5 for one reason or another.  That's not a
6 rarity.
7   Q.   I mean photos of autopsies.
8   A.   Yes, photos of autopsies, right, and
9 that happens, sure.
10   Q.   Has it ever happened in a criminal
11 case in which you've testified on behalf of the
12 prosecution?
13   A.   I think it probably has, yes.
14   Q.   Can you think of any particular
15 instance?
16   A.   No; I can't tell you a specific
17 case.  And if I then have gone on to testify, I
18 would then have seen the colored photos.  If
19 there are things that I cannot determine and
20 express opinions about because they're black
21 and white copies, then I will state that.  If
22 there are things which permit me to express
23 opinions even with that, then I will do so,
24 because I will be comfortable in the knowledge
25 that the actual colored photos are going to be

67

1 much more clear and definitive.
2   Q.   You were then sent some slides that
3 you took a look at; correct?
4   A.   Yes; there was some microscopic
5 slides, and I looked at those.  Those are the
6 ones that are referred to in the autopsy
7 report.  I have copies of those five slides.  I
8 mean, I shouldn't say copies of, duplicates of.
9   Q.   What were those slides of?
10   A.   Liver, heart, brain, lung and
11 kidney.
12   Q.   What were you looking for in those?
13   A.   It's just proper for a pathologist
14 looking at an autopsy report to look at micros,
15 and they showed really nothing, except what has
16 been set forth, and I would agree with the
17 pathologist, congestion that could be seen in
18 the section of the lung and in the section of
19 the kidneys and some very early changes in some
20 of the cells in the brain.  The liver and the
21 heart showed nothing.  I agree.  So I'm not
22 looking for anything specific but one never
23 knows.  I always ask for slides.  Some times I
24 get them and some times I don't.  Some times
25 they are essential.  In this case they are

68

1 really not essential.
2        And by the way, I would like to,
3 looking at the last two pages here, petechial
4 hemorrhages, refer you to page 6 of the report.
5   Q.   Of whose report?
6   A.   Of the autopsy report, page 6 in
7 which the pathologist sets forth the pathologic
8 diagnosis and you'll note under No. 3
9 summarizes, quote No. 3, "Florid petechial
10 hemorrhages involving in forehead, face,
11 eyelids, oral mucosa and labial mucosa."  That
12 is inside the lips and mouth.  So this is just
13 another point of reference on the petechial
14 hemorrhages.
15   Q.   Again, is it still your opinion that
16 it's not the location of the hemorrhages, but
17 it's the extent of the hemorrhages upon which
18 you base your opinion?
19   A.   That's correct.
20   Q.   There is a reference in the autopsy
21 report at page 3 under the paragraph evidence
22 of injury, third to the last sentence of that
23 paragraph that begins, "However, there was
24 marked suffusion of the base of the tongue and
25 congestion and enlargement at the lingual

69

1 tonsils."  What does that mean?
2   A.   Suffusion is synonymous with
3 congestion.  So at the base of the tongue he
4 found engorgement of the vessels and also the
5 tonsillar structures which are just off to the
6 sides.  So they were congested and he felt that
7 they were enlarged, the whole area, and then he
8 goes on, the retropharyngeal which means behind
9 the pharynx congestion, tracheo-larynx
10 congestion of the petechia.  So it all just all
11 fits in.
12   Q.   The next page, top paragraph under
13 beginning with the sentence the scalp was
14 reflected and then the next sentence says,
15 "There is marked petechial hemorrhages of the
16 galeal tissue."
17   A.   We pronounce it galeal.
18   Q.   Galeal tissue.  What part --
19   A.   That is the undersurface of the
20 scalp.
21   Q.   The next sentence the dura mater and
22 flax cerebri?
23   A.   It should be falx, F-A-L-X, falx
24 cerebri.  That is a membrane that comes down
25 between the two cerebral hemispheres.

18 (Pages 66 to 69)

70

1   Q.   It's supposed to be what word?
2   A.   Falx, F-A-L-X.  In other words, the
3 L and the A are turned around there, falx.
4   Q.   Then the sentence the leptomeninges?
5   A.   That is the arachnoid and pia.  You
6 have the three membranes.  The dura is the
7 thick membrane.  The arachnoid is a delicate
8 spiderweb like called the arachnoid, and the
9 pia is actually the outer most layer of the
10 brain cells, and those two are referred to as
11 the leptomeninges.  They were congested also.
12   Q.   What is the significance of the
13 congestion there?
14   A.   Just part of the asphyxial picture.
15   Q.   The next sentence, "The cerebral
16 hemispheres were symmetrical but edematous with
17 flattening of the gyri and broadening of the
18 sulci." What does that mean?
19   A.   The gyri are the convolution.  You
20 seen pictures of the brain, those curvy things.
21 Each one of those is a gyrus and plural gyri,
22 and sulcus, plural sulci, is the space between
23 any two gyri.  So they were edematous he noted
24 which would be part of the swelling of the
25 brain.  When the brain is insulted by not

71

1 getting enough oxygen, it swells, and that's
2 why he says the hemispheres were symmetrical
3 but edematous.  The edema is manifested by the
4 flattening of the gyri.  When it's not under
5 pressure, then there is room and they have a
6 little convexity there.  When they press up
7 against the inside of the dura, then they get a
8 little flattened, and as they get flattened and
9 widened, the space between the sulci changes.
10 So that is what he's describing there.
11   Q.   Under microscopic report there is a
12 reference to the slides relating to the lung?
13   A.   Yes.  We referred to that before as
14 one of the slides that I got.
15   Q.   The findings what is that?
16   A.   Septal congestion, the wall between
17 two air sacs which can only be seen
18 microscopically.  There are probably millions
19 of these.  That's, by the way, where the blood
20 gas exchange occurs giving up $CO_2$ and taking on
21 oxygen in the aveolar capillaries.  So this is
22 part of the congestion.  In the intra-alveolar
23 presence of red blood cells that means within
24 the air sacs, intra-alveolar presence.  So red
25 blood cells have already spilled out from these

72

1 capillaries as part of the congested process.
2   Q.   Does the congestion process continue
3 after the loss of consciousness?
4   A.   Yes, because you're still alive and
5 the heart is not doing its job, and so the
6 blood continues to back up and can give you
7 more congestion.
8   Q.   At what point does the congestion
9 process begin?
10   A.   Did you say begin?
11   Q.   Begin.
12   A.   It begins when whatever is causing
13 the asphyxiation begins.  So from the moment
14 that there is compression of in this case the
15 neck, the jugular vein, that's the beginning of
16 congestion.
17   Q.   So the congestion begins immediately
18 and the process continues until --
19   A.   Well, first you have to have some
20 pressure, not in a split second, but a few
21 seconds.
22   Q.   Begins within seconds of
23 compression?
24   A.   If the compression is significant.
25 You know, I can compress my neck here and that

73

1 is compression.  So when you talk about
2 significant compression, sufficient to compress
3 the jugulars.  I should make that clear, not
4 just somebody coming up and saying, hi, a
5 doctor feeling your pulse or even pressing down
6 more to see if you have enlarged lymph nodes or
7 so on.  That's compression, but that doesn't
8 mean a thing, and it's not going to produce
9 congestion.
10   Q.   I understand that, but significant
11 compression defined as you just defined it
12 means significant enough to compress --
13   A.   In this case the jugulars.
14   Q.   -- the jugulars?
15   A.   Right.  You are talking about the
16 neck, and then within a few seconds congestion
17 will commence.
18   Q.   And the process will continue until
19 the heart stops beating?
20   A.   Yes, but as you're dying, it's going
21 to become de minimus because in the dying
22 process the metabolism is decreasing and
23 everything is just ebbing and not much is
24 happening.
25   Q.   How are you being compensated in

19 (Pages 70 to 73)

74

1 this case?
2    A.   I received $5,000 for the case
3 review which is my standard fee.  That covers
4 the review and analysis of the documents and my
5 written report and included the examination of
6 the microscopic slides.  So all of that was
7 included, and then today I get paid for the
8 deposition, and I do charge the attorneys, this
9 is our law firm, $1,000.  We talked on the
10 phone yesterday, and I reviewed everything
11 again.  So again, it is a standard what I call
12 pre-deposition conference and then the charge
13 that was made, I believe, to you, and that's
14 standard $1,500 for the first two hours and
15 $500 for each hour thereafter.  Those are the
16 charges that have been made in this case.
17    Q.   Have you been paid anything else in
18 connection with this case?
19    A.   No, I haven't.
20    Q.   If you were to testify in connection
21 with this case if it were to go to trial, what
22 would your charge be?
23    A.   Standard fee I charge $5,000
24 per diem, plus reimbursement of necessary
25 travel expenses.

75

1    Q.   I'm going to show you, I marked it
2 as an exhibit, we haven't used it, a diagram
3 that's been marked as Exhibit 5.  Is that
4 generally --
5    A.   That's good.  Jugular veins you see
6 more outside, carotid.  It's simplistic but
7 it's quite good, and the trachea, the windpipe,
8 the thyroid cartilage, our Adam's apple.  Yes,
9 that is fine.
10         MR. OSTERMAN:  Those are all
11 the questions that I have.
12         MS. SARO:  If you don't mind,
13 Doctor, I don't want to be too long.  I'll be
14 really quick.
15         -----
16         EXAMINATION
17 BY MS. SARO:
18    Q.   I did bring the colored photos.  So
19 I thought if you wanted to look at them, you
20 could.  I would offer that to you at this
21 point.  If you want to just match them up with
22 the pictures that you showed Mr. Osterman.  I
23 don't think that it should take too long.
24    A.   If you're asking me to do that, then
25 I'll do it.

76

1         MR. OSTERMAN:  While you're
2 doing that, I want to run to the men's room
3 real quick.
4         (Short recess taken.)
5         MS. SARO:  Back on the record.
6    Q.   You've looked at these colored
7 photographs?
8    A.   Yes, I have.
9    Q.   Any changes in your testimony with
10 respect to the extent of the petechial
11 hemorrhaging that you see --
12         MR. OSTERMAN:  Object to the
13 form.
14    Q.   -- now that you've had an
15 opportunity to review the clear colored
16 photographs?
17    A.   No.
18    Q.   With respect to you were asked about
19 some, I guess, text material or source material
20 for the petechial hemorrhaging and the extent
21 that you saw them with respect to Deshaw Young
22 in this matter, and you said not one specific
23 text but generally just forensic textbooks?
24    A.   Well, there are many textbooks in
25 forensic pathology.

77

1    Q.   That is what I wanted to follow up
2 on that a little bit.
3    A.   There is DiMaio, D-i-M-A-I-O, and
4 DiMaio.  I think it's father and son.  There is
5 Bernard Knight, K-N-I-G-H-T.  There is --
6    Q.   Let me ask you this, Dr. Wecht, just
7 to try to sort of fast track it, so to speak.
8 There is no one specific authority --
9    A.   Spitz and Fischer, S-P-I-T-Z.
10    Q.   Is it a fair statement to say that
11 there is no one specific authority with respect
12 to the extent of the petechial hemorrhaging
13 that you would expect to see where the jugular
14 veins are compressed.  However, within the
15 realm of forensic pathology one would expect
16 that in the event that a situation occurred
17 such as in Deshaw Young's case it is, so to speak
18 jugular vein that is being compressed, you
19 would expect to see florid petechial
20 hemorrhaging?
21         MR. OSTERMAN:  Object to the
22 form.
23    Q.   Do you understand what I'm asking
24 you?
25    A.   Yes.  That is correct.  I can't

20 (Pages 74 to 77)

78

1 refer you to a specific. As you can imagine,
2 it's not possible to conduct an experiment on
3 living people. We can only work in
4 retrospective fashion which is what forensic
5 pathologists have done, and some times you know
6 some of the details of the scenario from third
7 parties, the assailants themselves, maybe
8 police or in accidental situations onlookers
9 and so on, and then you correlate those things
10 with what you find, and that's how knowledge
11 has accumulated with regard to injuries that
12 cannot be duplicated experimentally.
13    Q.    And that is within the realm of
14 forensic pathology?
15    A.    Yes.
16    Q.    That is something that you are well
17 versed and capable in rendering an opinion on?
18    A.    Yes.
19    Q.    I wanted to ask you one other
20 question with respect to the pathologist's
21 report, and I believe you also quoted it in
22 your report of January 17th. It's the notation
23 with regards to the superficial red colored
24 contusion just medial and below the left
25 nipple. Do you recall that?

79

1    A.    Yes; I remember that.
2    Q.    I'm reading at page 3, that finding
3 that contusion, would that be consistent with,
4 say, a person struggling against the washing
5 machine as they're being pulled in and trying
6 to get themselves free from the washing
7 machine?
8    A.    Yes. I believe that the level on
9 the chest wall would fit in with a contact with
10 the machine, and it certainly could be from
11 someone being pulled down and someone
12 struggling, so on. It would be consistent. I
13 think most likely that is when and that it
14 occurred. I can't tell you what was in
15 anybody's mind at the moment, but I think that
16 that is almost certainly the explanation for
17 that focal confusion.
18        MS. SARO: Thank you, Doctor.
19 I don't have anything else.
20        -----
21        EXAMINATION
22 BY MR. OSTERMAN:
23    Q.    To follow on that focal contusion,
24 if he was pulled in by the force of the sweater
25 being grabbed by the or caught on to the

80

1 spindle and he was pulled such that his chest
2 contacted the front edge of the washing
3 machine, could that cause a bruise.
4    A.    You said if he were pulled in?
5    Q.    Yes. In other words, let's assume
6 that that thing is spinning extremely fast.
7 Let's assume it pulled him with a very, very
8 hard force slamming his chest into the front
9 edge of the washing machine. Could that cause
10 a bruise?
11    A.    Yes.
12    Q.    And would it look exactly as
13 described there?
14    A.    Yes.
15    Q.    So the presence of the bruise
16 doesn't tell you whether he struggled beyond
17 that, does it?
18    A.    No, it does not.
19    Q.    With respect to the authorities that
20 you referenced, the DiMaio text, the
21 Bernard Knight and the Spitz and Fischer text,
22 those are just generally recognized forensic
23 pathology or at least pathology textbooks;
24 correct?
25    A.    Yes.

81

1    Q.    You are not saying that there is
2 anything specific in those texts that say or
3 that support your opinion regarding petechial
4 hemorrhaging or the extent of petechial
5 hemorrhaging as indicating whether the carotid
6 artery was involved with the jugular or just
7 the jugular?
8    A.    No, I am not. I really don't know,
9 and I would tell you if I had read those and
10 could point to something. And if I read them
11 and they disagreed, I sure wouldn't have given
12 you the names. So, no, I don't know what is
13 there. I'm just giving you some names of some
14 textbooks on forensic pathology.
15    Q.    Are you aware of any textbooks or
16 articles that disagreed with the opinions that
17 you've expressed today?
18    A.    I have not looked it up.
19    Q.    So you don't know one way or the
20 other?
21    A.    Insofar as what the textbooks say,
22 no, not specifically.
23    Q.    Or scientific literature of any
24 kind?
25    A.    No. That is right. I'm not giving

21 (Pages 78 to 81)

**82**

1 you any particular reference, because I don't
2 have a specific reference.
3   Q.   How about any articles that you've
4 written, have you ever written on this
5 particular subject?
6   A.   I have written on asphyxiation but
7 not on this, no.  You mean on this jugular and
8 with and without carotid compression and the
9 correlation of one and the other with the
10 amount of petechial hemorrhage?  The answer is,
11 no, I have not.
12   Q.   The articles that you've written can
13 you identify by the number of them, you've got
14 them listed there, can you identify those that
15 dealt specifically with asphyxiation.
16   A.   I'm going to guess at some of these
17 based upon titles.  Possibly No. 38, I would
18 put that with a question mark, 47, 92, possibly
19 208, possibly 242, 255, possibly 267, possibly
20 299, possibly 461, possibly 469.  Those are
21 ones that I think.
22       MR. OSTERMAN:  Thank you very
23 much.  Those are the questions I have.
24
25

**83**

1       (Signature not waived.)
2       (Whereupon, the above-entitled
3 matter was concluded at 1:50 p.m.)
4       -----
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**84**

1 COMMONWEALTH OF PENNSYLVANIA  ) E R R A T A
  COUNTY OF ALLEGHENY        ) S H E E T
2
3 FRANK YOUNG, et al
  vs.
4 FRIGIDAIRE COMPANY, et al
5
    I, CYRIL H. WECHT, M.D., J.D., have read
6 the foregoing pages of my deposition given on
  Wednesday, January 31, 2007, and wish to make
7 the following, if any, amendments, additions,
  deletions or corrections:
8
  Pg. No.  Line No.    Change and reason for
9 change:
10
11
12
13
14
15
16
17
18
19
    In all other respects the transcript is true
20 and correct.
21 _____
        CYRIL H. WECHT, M.D., J.D.
22
  Subscribed and sworn to before me this
23 _____ day of _____, 2007.
24 _____
    Notary Public          (MRC)
25

**85**

1 COMMONWEALTH OF PENNSYLVANIA  )
  COUNTY OF ALLEGHENY        )
2
3    I, Monica R. Chandler, a notary public
  in and for the Commonwealth of Pennsylvania, do
4 hereby certify that the witness, CYRIL H.
  WECHT, M.D., J.D., was by me first duly sworn
5 to testify the truth, the whole truth, and
  nothing but the truth; that the foregoing
6 deposition was taken at the time and place
  stated herein; and that the said deposition was
7 recorded stenographically by me and then
  reduced to typewriting under my direction, and
8 constitutes a true record of the testimony
  given by said witness, all to the best of my
9 skill and ability.
10    I further certify that the inspection,
  reading and signing of said deposition were not
11 waived by counsel for the respective parties
  and by the witness and if after 30 days the
12 transcript has not been signed by said witness
  that the witness received notification and has
13 failed to respond and the deposition may then
  be used as though signed.
14
    I further certify that I am not a
15 relative, or employee of either counsel, and
  that I am in no way interested, directly or
16 indirectly, in this action.
17    IN WITNESS WHEREOF, I have hereunto
  set my hand and affixed my seal of office this
18 12th day of February 2007.
19
20
21    S/Monica R. Chandler
22 ------------------------------
23 Monica R. Chandler
24
25

22 (Pages 82 to 85)

84

```
 1  COMMONWEALTH OF PENNSYLVANIA    )   E R R A T A
    COUNTY OF ALLEGHENY            )     S H E E T
 2

 3  FRANK YOUNG, et al
    vs.
 4  FRIGIDAIRE COMPANY, et al

 5
         I, CYRIL H. WECHT, M.D., J.D., have read
 6  the foregoing pages of my deposition given on
    Wednesday, January 31, 2007, and wish to make
 7  the following, if any, amendments, additions,
    deletions or corrections:
 8
    Pg. No.  Line No.     Change and reason for
 9  change:

10

11

12

13

14

15

16

17

18

19
    In all other respects the transcript is true
20  and correct.

21                    _____

22                    CYRIL H. WECHT, M.D., J.D.

23  Subscribed and sworn to before me this
    _____ day of _____, 2007.

24  _____
        Notary Public                     (MRC)
25
```