**EXHIBIT D**

**White Consolidated Industries, Inc.**
18013 Cleveland Parkway - Suite 100 -- P.O. Box 35920
Cleveland, Ohio  44135-0920
Phone: (216) 898-1800
Fax: (216) 898-2340

H.E. Buckles
(216) 898-2352
ed.buckles@electrolux.com

June 19, 2001

Ms. Valery V. Ceasar
Senior Compliance Officer
U.S. Consumer Product Safety Commission
Office of Compliance
4330 East West Highway
Bethesda, MD 20814-4408

      Re:   Epidemiologic Investigation Report 980716CCC6909

Dear Ms. Ceasar:

In January of 1999 we received the above captioned EIR and I responded that the incident was in litigation, therefor I could not comment further.  For your convenience I am enclosing a copy of the report.

On June 9, 2001 we reached an agreement with plaintiff's to resolve this matter by settlement.  In keeping with the terms of the settlement and our reporting obligations, I am submitting this report in the format of a 15(b) Substantial Product Hazard Report, however, White Consolidated Industries, Inc. (WCI) specifically denies that the product is defective, that a substantial product hazard exists and that an undue risk of injury exists.

1. Person Reporting:

   H. E. Buckles
   Senior Associate General Counsel
   White Consolidated Industries, Inc.
   P. O. Box 35820
   Cleveland, Ohio 44135-0920

2. Manufacturer:

   Electrolux Home Products (formerly Frigidaire)
   Webster City, IA

Ms. Valery V. Ceasar
June 19, 2001
Page 2

3. Product Identification:

   The specific product involved is a Frigidaire MWX233RES1 top loading washing machine. However, the design complained of, a lid locking system that allows the washer to agitate with the lid open but lock during the spin cycle, is universal on all of our top loading designs since approximately 1988. A similar design is on competitors' models, which allow lid-open agitation, but also allow access as the unit slows to a stop during the spin cycle.

   Some WCI models prior to 1988 had both an agitation shut off feature and a locking mechanism during the spin cycle; however, this was redesigned to allow for the unit to agitate with the lid open due to consumer preference and no perceived hazard.

4. Compliance:

   The product complies with UL 2157. In February 1998 the hazard of entanglement in washers was addressed by a joint meeting of manufacturers, UL and the CPSC. At that time, the WCI design was endorsed by the participants because it exceeded the standards established by UL 2157 as it provides positive protection during the spin cycle (the perceived hazardous operation) and provides a fail safe feature in that should the locking mechanism fail, it would fail in the locked position.

5. Injury:

   On June 21, 1998, a nine-year-old child, Amber Newcomb, was sent to the laundry room to add towels to a load of laundry already in process. According to Ms. Newcomb, in her recent deposition, she opened the lid and added the towels. They did not appear to be being drawn into the load and she began to push them down with her hand. She has, according to her testimony, no specific memory after that point. When found she was sitting on top of the washer with both feet in the tub, her right arm was entangled in a towel and damaged so severely that it was subsequently amputated. We had, until this recent deposition, been unable to obtain any undisputed facts on the accident due to the eccentricies of Oregon litigation. Unfortunately, because of the trauma of the accident or because of the medications that the child was on due to an ADD condition and some behavior control problems or some combination of those factors, even Ms. Newcomb's account leaves many details open. However, it does appear clear that in some circumstances an injury can occur.

   There has been a second reported injury which occurred on May 21, 1999 involving an adult who claims to have had her arm broken in a washer. In one account, it was during the spin cycle and in another account it was during the agitation cycle. Again this is in litigation and is being vigorously defended.

   Ms. Newcomb's legal counsel has indicated that they know of other incidents; however, these have never been provided to us.

Ms. Valery V. Ceasar
June 19, 2001
Page 3

6. Notice:

   Our first notice of any incident involving injury during agitation cycle was a letter from Ms. Newcomb's counsel in July 1998. We were unable to confirm any details until Ms. Newcomb's recent deposition.

   The second notice of injury was in November 1999 when we were advised that the injured party became entangled during the spin cycle. The lawsuit filed in August 2000 did not provide details. It appears that plaintiff will testify, although her deposition has not been taken, that she was injured in the agitation cycle.

7. Number of units:

   All of our 28", 24", and 27" top load washers and all our 24" and 27" laundry centers produced at our Webster City facility since 1979 have had the open agitation feature. This amounts to approximately 10 million units.

8. Dates of Manufacture:

   First date of manufacture was approximately 22 years ago. We are currently redesigning the units to provide the cut off during agitation and the positive lock during spin. We expect to have that product in production by October of this year.

9. Location of Product:

   For all practical purposes all product is in homes.

10. Changes:

    The product as currently manufactured meets all applicable codes and, except for the positive spin locking mechanism, is similar to other models by other manufacturers in the market.

    If a person should become entangled, the "off" button is located on the console of the machine and need only be pushed in to stop the machine immediately.

    The instructions that accompany the machine warn parents to supervise and train their children to operate appliances. Ms. Newcomb and her parents differ in their accounts of whether the child was shown how to properly use the machine. Ms. Newcomb says she was not told anything. In spite of other problems noted above, the child was not being supervised around the machine.

Ms. Valery V. Ceasar
June 19, 2001
Page 4

However, as indicated above, we are currently life testing a design change and ordering parts from suppliers to effect a design change that allows both the safest design on the market for protection during the spin cycle and the cut off during agitation to function without interference with each other and which will not be easily by-passed. We expect to be in production with the new design in October.

Further, should either the Commission or UL seek a change to UL 2157 requiring a shut off with the lid open during agitation applicable to all manufacturers, we would obviously support such a change.

11. Public Notice:

No public notice is contemplated. Our unit is safer than many other units on the market. One manufacturer has, within the last few years, begun to lock the lid on their units during all cycles, but we understand that that is due to concerns with an aggressive agitation cycle that splashes water out on to the floor and is not related to any entanglement issues.

There has been, to our knowledge, only the one verified incident in twenty years (two, if the second incident noted above is verified). If one assumes that half of the 10 million produced are operating in any one year, and if each is used five times a week, fifty weeks a year, that results in approximately 20 billion uses in 20 years with one (perhaps two) incidents. This statistic relates only to our units; if one would factor in the similarly operating washers of other manufacturers, the incident rate is, we believe, even smaller.

12. Repair/retro-fit:

None contemplated.

13. Marketing:

Units have been and are being sold through a variety of independent retail outlets including large national chains.

Ms. Valery V. Ceasar
June 19, 2001
Page 5

As previously noted, WCI does not believe this incident raises any issue of substantial product hazard or undue risk of harm. We consider the information herein provided to be proprietary and ask that it be treated as such.

We are taking no further action at this time. If you have questions, please feel free to contact me.

                          Very truly yours,

                          H. E. Buckles
                          Senior Associate General Counsel

HEB/mef
Attach.

**GAYLORD EYERMAN BRADLEY, P.C.**
Attorneys at Law
1400 S.W. Montgomery Street
Portland, Oregon 97201-2557

William A. Guylord
Linda K. Eyerman
Todd A. Bradley
Deanna L. Wray

Telephone: (503) 222-3526
Facsimile: (503) 228-3628

July 2, 2001

**SENT VIA FEDERAL EXPRESS**

Valery V. Ceasar
Senior Compliance Officer
U.S. Consumer Product Safety Commission
Office of Compliance
4330 East West Highway
Bethesda, Maryland 20814-4408

RE:   Epidemiologic Investigation Report 98716 CCC6909

Dear Ms. Caesar:

My law firm represents ███████████, a nine-year-old girl whose right arm was torn off by the agitating action of a top-loading washing machine manufactured by White Consolidated Industries. On behalf of the ███████ family, I reported Amber's injury to the CPSC in July, 1998 (see EIR 980716CCC6909). A lawsuit was later filed against the manufacturer, and was scheduled to begin trial on June 25, 2001, in Portland, Oregon. The lawsuit was settled two weeks before trial.

I want to share with you some of the terms of the settlement, since they are unusual and reflect the dedication of the Newcomb family to the idea that this lawsuit had two purposes: one being compensation for Amber, and the other being prevention of other future injuries. This second purpose became especially important when our investigation revealed that the washing machines made by White (and sold under the Westinghouse, Frigidaire, Gibson, Kelvinator and Tappan brand names) have the <u>most aggressive</u> agitation action of any machines on the market, and yet lack any safety device to stop the action when the lid is opened during the agitation cycle.

In addition to $3 million in monetary compensation for Amber, the terms of the settlement include the following non-monetary consideration:

- Every top-loading washing machine which leaves the factory beginning October 22, 2001, will be equipped with a safety device to stop the action when the lid is opened during the agitation cycle.

- The company will file a 15(b) substantial product hazard report with the CPSC, within ten days of the settlement. A copy of the 15(b) report will be provided to the Newcomb family, who will have a right to file supplemental information with

Valery V. Ceasar
July 2, 2001

Page 2

the CPSC. The CPSC may order a recall/retrofit of washing machines currently in use, and may fine the company for late reporting.

• The company will make retrofit kits available to consumers at cost, through their website and through service personnel, beginning October 22, 2001.

• The company will support a change in Underwriters Laboratories standard 2157, §20.8, which currently only requires a safety device to stop the action when the lid is opened during the spin cycle.

A 15(b) report prepared by White's counsel was sent to you on June 19, 2001, but it does not include adequate information to allow CPSC to assess the hazard and understand the undue risk of harm to consumers from this defective design. Thus, in keeping with the terms of the settlement, and with your permission, we would like to submit materials to supplement this report. Specifically, we would like to submit materials prepared in connection with the lawsuit which demonstrate the nature and extent of the hazard, as well as sworn deposition testimony from White's own engineers and former engineers about the importance of protecting consumers now that Amber's injury has clearly brought this hazard to their attention. This information is critical to any decision by CPSC a) to require modification of White's top-loading washing machines currently in use, most of which present the same hazard to consumers as presented by the ███████ washing machine, and b) to propose a change in Underwriters Laboratories Standard 2157, which currently allows this hazard to exist.

It should be noted that many of White's competitors employ safety devices which protect consumers from access to the moving parts during agitation. In fact, many of White's own washing machines manufactured during the 1970s and 1980s were equipped with lid switches which cut off power to the motor whenever the lid was opened during agitation. According to White, this safety feature was abandoned during a redesign for cost-cutting purposes, and because the company felt that consumers would be impressed by seeing its aggressive agitating action. When this decision was made, the company knew that injuries could occur from contact with moving parts during agitation, but denies knowing that an injury of the magnitude of Amber's injury could occur. Since becoming aware of Amber's injury, White has agreed to implement a safety solution which will protect future purchasers of its top-loading washing machines, but is unwilling to voluntarily solve the problem for the millions of consumers who purchased washing machines manufactured by White before October 22, 2001.

Our plan is to submit supplemental materials by July 16, 2001. In the meantime, I request that any action on White's 15(b) report be deferred pending receipt of additional information.

Valery V. Ceasar
July 2, 2001

Page 3

Thank you for your attention to this matter, and feel free to contact me if you have questions or concerns.

Very truly yours,

GAYLORD EYERMAN BRADLEY, P.C.

*Linda K. Eyerman*
Linda K. Eyerman

LKE:cb

cc: ███████████

77

# ⊞ Electrolux

18013 Cleveland Parkway - Suite 100
P.O. Box 35920
Cleveland, Ohio   44135-0920
Telephone (216) 898-1800
Fax (216) 898-2340

H.E. Buckles
Senior Associate General Counsel
(216) 898-2352

ed.buckles@electrolux.com

October 31, 2001

Ms. Judith Hays
U.S. Consumer Products Safety Commission
4330 East West Highway, 6th Floor
Bethesda, MD  20814-4408

Re:   Epidemiological Report 980716CCC6909
      Amber Newcomb

Dear Ms Hays:

I understand that you are undertaking an investigation of this incident and I recently sent you a copy of our 15(b) report.

I have become aware that on October 16, 2001 counsel for the Newcomb's conducted a press conference from their office in Portland, Oregon.

The report I have read contains several allegations that are patently wrong and, while would have been subject to challenge in a court, are simply fuel to fire emotions without basis in fact.

For example, the allegation is made that White Consolidated Industries removed a safety switch for economic reasons. The switch change over came about over ten years ago when we acquired a brand that had a switch much like the current standard in the industry (a braking mechanism instead of our positive lock during "spin"). We converted that lock to the standard that we have used for over ten years and which exceeds all current standards. It is also the mechanism that several years ago was tentatively endorsed by the Commission and UL as the best on the market. There was no evidence that this change was made for economic reasons.

Further the impression that our re-design, that we are currently testing, was undertaken only because the Newcombs or their counsel insisted is also wrong. The agreement we signed with the Newcombs simply reflected the timetable for the re-design that we had already independently established and undertaken prior to the settlement. That timetable has slipped slightly because testing of the new design indicates that it fails to meet our reliability standards. We still hope to have the new design in the marketplace before year-end, depending in large measure on our supplier's ability to deliver reliable components.

Ms. Judith Hays
U.S. Consumer Products Safety Commission
October 31, 2001
Page 2

Our current design, which locks the unit during the spin cycle, remains the safest product in the market, but because we believe that, with time and effort, we can improve that safety we continue our re-design efforts.

If you have questions, please contact me at your convenience. We believe that rational discourse and not one-sided news conferences will result in good decisions.

Very truly yours,

*H. E. Buckles*

H. E. Buckles

HEB/mef

| 1. CASE NO.<br>980716CCC6909 | 2. INVESTIGATOR ID<br>8232 | 3. OFFICE CODE<br>860 | EPIDEMIOLOGIC INVESTIGATION REPORT |
|---|---|---|---|
| 4. DATE OF INCIDENT<br>980621 | 5. DATE INITIATED<br>980722 | | |

A nine year old female's arm was partially severed after it became entangled in towels that she loaded into a washing machine. The washing machine apparently was operating on the first agitation cycle and the action of the agitator machine broke both bones in the victim's forearm and caused the ends of the bone to cut the surrounding tissue. The victim was transported to a local hospital and airlifted to an urban trauma center. Six surgeries performed to save the victim's arm were unsuccessful and the arm was amputated below the elbow. The victim also suffered complications from tissue graft removed from her leg and was still hospitalized one month after the event.

| 7. LOCATION<br>home 1 | 8. CITY<br>Central Point | 9. STATE<br>Oregon OR |
|---|---|---|
| 10A. FIRST PRODUCT<br>washing machine 0126 | 10B. TRADE/BRAND NAME<br>Frigidaire | 10C. MODEL NUMBER<br>Model: MWX233RES1<br>Serial: XC75149901 |
| 10D. MANUFACTURER NAME AND ADDRESS<br>Frigidaire<br>POB 718, Dublin, OH 43017 | | |
| 11A. SECOND PRODUCT<br>towels 0666 | 11B. TRADE/BRAND NAME<br>unknown | 11C. MODEL NUMBER<br>unknown |
| 11D. MANUFACTURER NAME AND ADDRESS<br>unknown | | |

| 12. AGE OF VICTIM<br>009 | 13. SEX<br>02 female | 14. DISPOSITION<br>4 admitted | 15. INJURY DIAGNOSIS<br>amputation 50 |
|---|---|---|---|
| 16. BODY PART<br>33 lower arm | 17. RESPONDENT<br>03 attorney | 18. TYPE INVESTIGATION<br>03 other | 19. TIME SPENT<br>14.0 hr |
| 20. CATEGORY<br>SECT J 1998 | 21. CASE SOURCE<br>hot line 07<br>H9870133A | 22. SAMPLE COLLECTION NUMBER<br>none | |
| 23. PERMISSION TO DISCLOSE NAMES (NON-NEISS CASES ONLY) | | YES: | NO XX |
| 24. REVIEW DATE | 25. REVIEW BY<br>8101 | 26. REGIONAL OFFICE DIRECTOR | |

| 27. DISTRIBUTION |
|---|
|  |

CPSC FORM NO. 182 (12/96) Approved for use through 5/31/2000  OMB No. 30410029

980716CCC6909

The respondent was the victim's family attorney.

**Pre-Event**

The victim was a healthy normal 9 year old female who lived with her parents and younger siblings. The respondent said that the victim was bright and helped her parents with household chores. The respondent said that helping with the family laundry was one of the victim's routine chores.

The respondent said that the family was preparing for a Father's Day outing at a lake. The respondent said that they decided to wash a load of towels before they left. The respondent said that a load of towels was placed in the washing machine and the washing machine was started. The respondent said that the victim found a couple of extra towels proceeded to add the towels to the washing machine.

**Event**

The respondent said that the victim placed the extra towels in the washing machine. The respondent said that exact scenario was not known at this time. The respondent said that the washing machine may have just completed filling with water and started agitating as the victim loaded the towels, or the washing machine may been running in the first agitation cycle when the victim loaded the extra towels.

The respondent said that the victim's forearm apparently became entangled in the towels as the towels were pulled into the agitator of the washing machine. The respondent said that the motion of the agitator broke both of the bones in the victim's forearm. The respondent said that the victim was unable to free

herself and the motion of the agitator caused the ends of the broken bones to cut the surrounding tissue until the victim's arm was almost completely severed.

980716CCC6909

The respondent said that the victim screamed for help as the event occurred. The respondent said that the victims's father came to her assistance. The respondent said that the father unplugged the washer power cord and freed the victim. The respondent said that the family called for emergency medical assistance.

Post Event

The respondent said that local emergency medical assistance arrived and treated the victim at the scene. The respondent said that the victim was transported by ambulance to a local hospital, examined and transported (approximately 275 miles) by helicopter to an urban trauma center. The respondent said that surgery was performed six times as part of an effort to save the victim's arm.

The respondent said that efforts to save the victim arm were unsuccessful. The respondent said that the victim's arm was amputated below the elbow. The respondent said that the victim suffered complications from the graft surgery and was unable to walk one month after the event. The respondent said that the victim was transferred from the urban hospital to a rehabilitation ward in a hospital closer to her home.

The victim's family retained the services of an attorney. The attorney contacted CPSC and shared preliminary information about the event. The attorney said that the family was still recovering from the event and requested that CPSC staff not contact the family directly. The respondent furnished a preliminary medical report. The respondent offered to provide

additional medical information when the information is received from the hospitals.

### First Product Identification

Manufacturer:   Frigidaire
                P.O. Box 7181
                Dublin, OH 43017

Model:   MWX233RES1
Serial:  XC75149901

The product identification information was provided by the respondent. The respondent said that the washer was a top loading automatic washer which was purchased new approximately three months before the event. The respondent said that the washer is in the possession of a forensic engineer at this time. The washer was not available for CPSC examination at the writing of this report. Copies of the respondent's photographs, the washer manual and related documents are attached to this report as exhibits.

### Second Product Identification

The respondent said that the towels were ordinary bath towels. No specific product identification was available. The forensic engineer has possession of the towels. The towels were not available for examination at the writing of this report.

### Standards Information

No standards information was available.

### Attachments

Exhibit # 1:   Emergency Medical Services Report
Exhibit # 2:   Product Registration Card
Exhibit # 3:   Operating Instructions

Exhibit # 4:   Owners Guide
Exhibit # 5:   Installation Instructions
Exhibit # 6:   Photographs